In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 06-3517 & 06-3528

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAWRENCE E. WARNER and
GEORGE H. RYAN, SR.,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 02 CR 506-1, 4—**Rebecca R. Pallmeyer**, *Judge.*

---

ARGUED FEBRUARY 20, 2007—DECIDED AUGUST 21, 2007[Œ]
OPINION PUBLISHED SEPTEMBER 6, 2007

---

Before MANION, KANNE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This appeal comes to us after an investigation that lasted for years and a jury trial that lasted more than six months. In the end, the two defendants, former Illinois Governor George H. Ryan, Sr., and his associate Lawrence E. Warner, were convicted on various criminal charges. The case attracted a great deal of public attention, and thus the district court handling the trial had to deal with a number of problems, some of which were common and others less so. The fact that the

---

[Œ] This opinion was originally released in typescript on August 21, 2007.

trial may not have been picture perfect is, in itself, nothing unusual. The Supreme Court has observed more than once that "taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." *United States v. Lane*, 474 U.S. 438, 445 (1986) (quoting *United States v. Hasting*, 461 U.S. 499, 508-09 (1983)). It is our job, in this as in any other criminal appeal, to decide whether any of the court's rulings so impaired the fairness and reliability of the proceeding that the only permissible remedy is a new trial.

Defendants Warner and Ryan raise eight grounds on appeal, six of them common and one argument unique to each. Their primary emphasis is on specific issues about the jury. They contend that the verdict was tainted by jurors' use of extraneous legal materials. They characterize the dismissal of a juror as an "arbitrary removal of a defense holdout." They object to the substitution of jurors after deliberations had begun. They also raise claims unrelated to the jury, including the arguments that the exclusion of certain evidence was an "erroneous exclusion of exculpatory evidence," that the prosecution failed to identify an "enterprise" for purposes of its charges under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and that the mail fraud charges were grounded in an "unconstitutionally vague criminal statute," see 18 U.S.C. § 1346. Warner additionally objects to the joinder of his trial with Ryan's, and Ryan argues that certain grand jury testimony violated his attorney-client privilege.

Some potential issues, we note, are not before us. The defendants do not argue that the problems with the jury had a cumulative, prejudicial effect, even though they made this argument in their motion for a new trial before the district court. Nor do they claim that the evidence was insufficient to support any of the charges on which

they were convicted. Rather, their appeal is focused on particular alleged procedural and legal errors. As we would in any case, we review only those issues presented to this court. We conclude that the district court handled most problems that arose in an acceptable manner, and that whatever error remained was harmless. We therefore affirm the convictions.

**I**

The facts of this case are well-known, and so we recite only what is necessary to understand the issues on appeal. In December 2003, a grand jury returned a 22-count indictment against Warner and Ryan. After a lengthy trial, on April 17, 2006, a jury found Warner and Ryan guilty on all counts. On September 18, 2006, the district court set aside the jury's verdict with respect to two separate mail fraud counts against Ryan and then entered judgment against both defendants on the remaining counts. The court sentenced Warner to 41 months' imprisonment and Ryan to 78 months' imprisonment. The defendants both filed timely notices of appeal on September 20, 2006.

The story behind this case began in November 1990 when Ryan, then the Lieutenant Governor of Illinois, won election as Illinois's Secretary of State. He was re-elected to that post in 1994. Throughout Ryan's two terms in that office, Warner was one of Ryan's closest unpaid advisors. One of Ryan's duties as Secretary of State was to award leases and contracts for the office, using a process of competitive bidding for major contracts and selecting leases based on the staff's assessments of multiple options. Improprieties in awarding four leases and three contracts form the basis of the majority of the RICO and mail fraud counts against Warner and Ryan, as these leases and contracts were steered improperly to Warner-controlled entities. The result was hundreds of thousands

of dollars in benefits for Warner and Ryan. These benefits included financial support for Ryan's successful 1998 campaign for Governor of Illinois.

Prospective jurors for the trial in this case filled out a 110-question, 33-page form, which covered among many other topics the subjects of their criminal and litigation histories, their knowledge of the investigation of Ryan, and their awareness of Ryan's positions on public issues. Counsel for all parties and the court reviewed the questionnaires for four days; *voir dire* consumed another six days. The district court seated 12 jurors and eight alternates. The trial lasted six months. The prosecution presented approximately 80 witnesses against the defendants. In the end, the evidence supporting the jury's verdict was overwhelming. We give only a few examples here from the extensive record that was created. To begin with, the evidence showed that Ryan steered an $850,000 four-year Secretary of State's office lease to Warner for a property that Warner had recently purchased for just $200,000. Ryan took regular Jamaican vacations paid for by a currency-exchange owner to whom Ryan later steered a $500,000 six-year Secretary of State's office lease. Ryan took a Mexican vacation paid for by an individual to whom Ryan later steered another Secretary of State's office lease and a lobbying contract worth nearly $200,000 for virtually no work. Warner received more than $800,000 for helping a company land a major Secretary of State's office contract without registering as a lobbyist and added another of Ryan's friends into the arrangement at Ryan's request before the contract was awarded. Finally, and remarkably, despite evidence showing that they were enjoying a very nice lifestyle, Ryan's and his wife's total withdrawals from their bank accounts averaged less than $700 per year for 10 years.

The jury retired on March 13, 2006. This jury deliberated for eight days. During their deliberations, the jurors

were allowed occasional breaks so that some jurors could smoke outside. At the same times, some of the other jurors would go outside for fresh air or walk up and down the courthouse stairwells for exercise. No one formally objected to the court about these activities. On at least one occasion, the court noted that the jurors were accompanied by court personnel when on breaks. Putting media accounts and testimony that the district court discredited to one side, there is no basis in the record to conclude that any deliberations took place when the jurors were separated from one another.

It was not long before problems arose. On Monday, March 20, 2006, Juror Ezell sent the court a note, also signed by the foreperson, complaining that other jurors were calling her derogatory names and shouting profanities. The court conferred with counsel and responded with a note instructing the jurors to treat one another "with dignity and respect." Two days later, the court received a note from Juror Losacco signed by seven other jurors, asking if Juror Ezell could be excused because she was refusing to engage in meaningful discourse and was behaving in a physically aggressive manner. The court again conferred with counsel, noting that "[Losacco] has not told us anything about the way the jury stands on the merits. She really has not." The next morning the court responded with a note, which began, "You twelve are the jurors selected to decide this case." The note then reiterated that the jurors were to treat each other with respect and reminded them of their duties.

On the eighth day of deliberations, a few hours after the court responded to the Losacco note, media reports surfaced claiming that one of the jurors had given untruthful answers on the initial juror questionnaire regarding his criminal history. The court stopped the jury's deliberations while it looked into the new allegations. After a background check confirmed that Juror Pavlick had not disclosed a felony DUI conviction and a misdemeanor

reckless conduct conviction, the court questioned him individually. The court asked counsel if there would be any objection to dismissing Pavlick. Neither the prosecutor nor Ryan's counsel voiced any objection when Warner's counsel moved to dismiss Pavlick or when the court granted that motion.

It turned out that Juror Ezell's record was also problematic. A background check turned up seven criminal arrests, an outstanding warrant for driving on a suspended license, and an arrest under a false name, "Thora Jones." The fingerprints of the "Thora Jones" arrestee matched Ezell's, and it turned out that the name "Thora Jones" might belong to Ezell's daughter, who also has a significant criminal history. The government told the court that it would have moved to excuse Ezell for cause had it known during *voir dire* that she had given law enforcement officers false booking information, as the Ryan-Warner case also involved charges of providing false information to law enforcement officers. The court replied that "I suspect there would not have been an objection [to that cause challenge]. She would have been excused." The court proceeded to question Ezell, who acknowledged her untruthfulness. Even then, however, she was not forthcoming about her use of the name "Thora Jones" or about her daughter's criminal history. The court concluded that "some of the answers she just gave me . . . aren't truthful." Warner's counsel agreed that Ezell should be excused, while Ryan's counsel took no position initially. When the government moved to dismiss Ezell, Ryan's counsel objected to the standard employed but did not object to the decision to remove Ezell based on her untruthfulness.

The court also questioned a number of other jurors. It turned out that Jurors Gomilla and Talbot both had filed for bankruptcy in the mid-1990s, but neither included

this information in response to a question about whether they had ever appeared in court or been involved in a lawsuit. That question, however, appeared in a section entitled "Criminal Justice Experience." Several other jurors had also left that question blank: Juror Svymbersky, an alternate, who stole a bicycle at age 18 or 19 in 1983 and thought that the charges had been expunged; Juror Rein, who was arrested for assault for slapping his sister in 1980, but never appeared in court; Juror Casino, who had three arrests that he had not remembered when filling out the questionnaire, because they occurred 40 years earlier, in the 1960s, when he was in his early 20s; and Juror Masri, an alternate, who reported a 2000 DUI conviction but had said nothing about a 2004 DUI conviction or about his conditional discharge or probation in September 2005.

The defense argued that Svymbersky, Rein, Casino, and Masri should be dismissed for dishonesty, while the government took the position that all four were fit to serve. The district court initially was inclined to excuse Svymbersky and Masri, but it chose to re-interview Casino and Svymbersky, who both again stated that they had not recalled the incidents when filling out their questionnaires. The district court credited the testimony of Svymbersky, Rein, and Casino, concluding that they did not lie to the court. The district court did not credit Masri's testimony and excused him; no one objected. (We acknowledge the dissent's concern that the court did not state explicitly that it was granting the defendants' motion to excuse Masri for cause. Looking at the record as a whole, however, it is clear that this is what the court did. There was no other motion related to Masri pending, and the court had stated that jurors would be dismissed only for cause. If the court was not excusing Masri for cause, but instead seating alternates out of order, Masri would have remained an alternate as opposed to being excused. More importantly,

though, no one has objected to the characterization of Masri's dismissal as one based on cause.)

In light of the dismissals, it became necessary to seat alternates Svymbersky and DiMartino on the jury in place of Ezell and Pavlick. At that point, as authorized by FED. R. CRIM. P. 24(c)(3), the court decided that the reconstituted jury would need to start its deliberations from scratch. It questioned each of the remaining original jurors to ensure that they understood their obligation to disregard whatever had gone on before and to begin deliberations anew, and that they felt capable of doing so. They all answered yes. The court then re-read its instructions to the reconstituted jury, adding a new one to allay defense concerns with the questioning about the jurors' criminal histories. The new jury began deliberating on March 29, 2006. After 10 days' work, it returned guilty verdicts on all counts on April 17, 2006.

After the verdict, dismissed juror Ezell publicly criticized the jury and the verdict. On April 25, 2006, defense counsel asked the court to conduct a formal inquiry into her comments. On April 26, the court held a hearing on the motion in open court, during which the government noted that "nothing that [Ezell] has said . . . indicated any extraneous influence occurred." The court determined that "the allegations that Ms. Ezell appears to be making [do not] constitute the kind of misconduct [that would require an inquiry]." At some point later that day or the next day, defense counsel learned through new media reports that Ezell had alleged that Juror Peterson had brought "case and law" into the jury room about removing a juror for failing to deliberate. Defense counsel filed a new motion for an inquiry, which the court granted. On May 5, 2006, the court opened its inquiry into Ezell's allegations, interviewing both Ezell and Peterson. Ezell told the court that she had previously forgotten about "the case law" to explain why she had not previously men-

tioned the incident. Peterson acknowledged bringing into the jury room an article published by the American Judicature Society (AJS) (which she found by conducting a Google search of the term "deliberating") about the substitution of jurors and a handwritten note recording her own thoughts about the duty to deliberate. She read a portion of the article and the handwritten note to the rest of the jurors. The court concluded that these two excerpts "did not prejudice the outcome" and ultimately denied the defendants' motion for a new trial on that (and several other) grounds.

## II

Both Warner and Ryan assert that the court's ruling on this "extraneous evidence" was wrong, prejudicial, and requires a new trial. A preliminary question that influences the rest of the analysis is whether either one, or both, of these items should be characterized as "extraneous" evidence. The district court concluded that the AJS article was, but that Juror Peterson's personal note was not.

## A

Read in isolation, Peterson's note is hard to criticize. It said:

> You have the right to speak your opinion, but you have responsibility to use the facts[,] the testimony to support your opinion to seriously consider [sic]. If you don't use evidence and testimony to support your opinion your [sic] not being responsibly [sic].

The proper characterization of this note is a question of fact, which we review for clear error. *United States v. Mancillas*, 183 F.3d 682, 695 (7th Cir. 1999). Juror Peter-

son told the district court that her handwritten statement came from her own, independent thoughts. The district court credited that testimony, noting the lack of overlap between the subject of the AJS article and Peterson's note, as well as the similarities between Peterson's note and the court's instructions to the jury on their duty to deliberate.

Credibility findings are "binding on appeal unless the district judge has chosen to credit *exceedingly* improbable testimony." *United States v. Hubbard*, 61 F.3d 1261, 1278 (7th Cir. 1995) (emphasis in original). There is no reason to question the district court's assessment of Juror Peterson's explanation about the note, let alone any indication that Peterson's account was "exceedingly improbable." The defendants' trial counsel were present when the district court discussed the note with Peterson and were permitted to ask questions. The defendants imply that Peterson could not have composed the note without assistance from external sources, apparently on the theory that it expressed concepts beyond the capability of a kindergarten teacher (which is Peterson's profession). We cannot imagine why either we or the district court was required to draw any such inference, which is more than a little patronizing. Thus, the defendants are left only with the fact that Peterson put her thoughts on paper. Had she simply spoken those words to the jury without writing them first, FED. R. EVID. 606(b) would bar any consideration of them at all. We conclude that the district court did not err in determining that this note was not extraneous information and did not require any further action.

**B**

The AJS article was indisputably extraneous information in the jury room. It dealt generally with the subject of

juror removal and substitution. The excerpt that Peterson read to the jury was the following:

> But other bases for substitution raise serious questions about the sanctity of the deliberative process, primarily allegations by some jurors that another juror is unwilling or unable to meaningfully deliberate, or is unwilling to follow the law. Such an allegation requires a hearing where the judge must decide the tricky question whether the juror is truly unfit to serve, or is merely expressing an alternative viewpoint that will likely result in a hung jury. Only if the judge concludes that the challenged juror is truly unfit to serve, will the judge be authorized to dismiss that juror and substitute an alternate juror.

In essence, Peterson's act of reading that paragraph introduced new instructions into the jury room about the deliberative process, beyond those given by the court. There is no doubt that this should not have happened. The only question is whether it is such a fundamental error that it requires automatic reversal, or if it is subject to harmless error analysis.

The Supreme Court has repeatedly stressed the fact that so-called structural errors—those that fall outside the boundaries of harmless error analysis—are few and far between. Most recently, the Court found that a constitutional error in failing properly to apply the rule of *Blakely v. Washington*, 542 U.S. 296 (2004), was subject to harmless error analysis. See *Washington v. Recuenco*, 126 S.Ct. 2546 (2006). The Court explained:

> We have repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, "'most constitutional errors can be harmless.'" *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Arizona v. Fulminante,* 499 U.S. 279, 306 (1991)). "'[I]f the

defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.'" 527 U.S. at 8 (quoting *Rose v. Clark*, 478 U.S. 570, 579 (1986)). Only in rare cases has this Court held that an error is structural, and thus requires automatic reversal.

126 S.Ct. at 2551 (footnote deleted). In a footnote, the Court reviewed the six "rare" areas where automatic reversal occurs: complete denial of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Id.* at n.2. It also recalled that its earlier decision in *Neder* had involved defective jury instructions, and that it had applied harmless error analysis there. *Id.* at 2551.

The defendants do not contend that anything that *Recuenco* recognized as structural error occurred here. Instead, their argument is about jury instructions and external influences on the jury. The Court repeatedly has subjected challenges to external influences on jurors to harmless error analysis. In *United States v. Olano*, 507 U.S. 725, 738 (1993), it wrote that "[w]e generally have analyzed outside intrusions upon the jury for prejudicial impact." The Court summarized its "'intrusion' jurisprudence" by stating that "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *Id.* (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Under *Neder* and similar cases, the introduction of the excerpt from the AJS article into the jury room is subject to harmless error analysis.

In evaluating it in this light, we bear two things in mind. First, we have held, and we reaffirm, that district courts

"retain . . . substantial discretion over the determination of whether the prejudice arising from the unauthorized contact is rebutted or harmless." *United States v. Sababu*, 891 F.2d 1308, 1335 (7th Cir. 1989); see also *Evans v. Young*, 854 F.2d 1081, 1084 (7th Cir. 1988). The relevant question is thus whether the court abused its discretion in making that determination. *Sababu*, 891 F.2d at 1334. Second, context matters. Many cases in which extraneous information made its way into the jury room involve evidence relevant to the defendant's guilt or innocence. See, *e.g.*, *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996) (unadmitted transcript of admitted recording that labeled one speaker as the defendant although identification was in dispute); *Sababu*, 891 F.2d at 1332-33 (unadmitted transcript of defendant's unadmitted recorded conversation with a co-defendant); *United States v. Bruscino*, 687 F.2d 938, 941 (7th Cir. 1982) (*en banc*) (Bureau of Prisons document about the defendant's possible membership in a prison gang and a newspaper article about the case). The excerpt from the AJS article did not. Compare *United States v. Estrada*, 45 F.3d 1215, 1226 (8th Cir. 1995), *vacated on other grounds*, 516 U.S. 1023 (1995) (differentiating between external information that merely supplements the court's instructions and factual evidence not developed at trial).

We first consider whether the district court applied the proper legal standard for its inquiry. A district court's failure to use the proper legal standard is an abuse of discretion. *United States v. Austin*, 103 F.3d 606, 609 (7th Cir. 1997). A district court also abuses its discretion if the record contains no evidence on which the court could have relied or if its findings of fact are clearly erroneous. *United States v. Jain*, 174 F.3d 892, 899 (7th Cir. 1999).

This court has looked to the Supreme Court's decision in *Remmer v. United States*, 347 U.S. 227, 228 (1954), in

order to develop a legal standard in this area. *Sababu*, 891 F.2d at 1335. In *Remmer*, the Court considered the case of a juror who supposedly was offered a bribe for a vote to acquit. 347 U.S. at 228. The FBI was brought in to question the juror, and the district court concluded that the bribe was a joke, but the defendant was never told about the allegation. *Id. Remmer* held that

> [i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Id.* at 229. The Court also said, however, that "[t]he presumption is not conclusive, but the burden rests heavily on the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.* It cautioned that inquiries of jurors about extraneous influences must strike a balance between the need to ensure that no prejudice has occurred and the need to let jurors deliberate unimpeded. *Id.*

District courts have some flexibility in structuring an inquiry into this kind of problem. *Bruscino*, 687 F.2d 938 at 940. Sometimes the circumstances are such that the *Remmer* presumption does not even apply. Thus, in *Whitehead v. Cowan*, 263 F.3d 708, 723 (7th Cir. 2001), we held that it did not apply to the publication of jurors' names and addresses by the media. *Whitehead* also suggested that "no *Remmer* hearing is necessary" where a "comment heard by a juror was ambiguous and innocuous." 263 F.3d at 725-26. We need not explore when a hearing may not be essential, however, since the district

court held one here. The general rule is that the district court "'should determine the circumstances [surrounding the improper contact] and the impact thereof on the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.'" *Sababu*, 891 F.2d at 1335 (quoting *Remmer*, 347 U.S. at 230).

The defendants argue that this standard does not adequately protect the deliberative process. They urge the adoption of a standard under which "any reasonable possibility of prejudice" from the external influence automatically entitles a defendant to a new trial. This, however, would represent a significant extension of the law. In our view, such an extension is not warranted and would in fact be inconsistent with the Supreme Court's approach to harmless error. If the district court is able to take remedial measures that remove the possibility of prejudice, or if it finds after a hearing that the Government has rebutted the presumption of prejudice, no new trial is required.

The district court described the approach it took to this issue as "a two-pronged inquiry." It said that it would determine "whether there was an extraneous influence on the jury, [and] whether from an objective perspective . . . what happened was prejudicial." The parties agreed to the judge's approach. Moreover, in the court's memorandum and order denying the defendants' motion for a new trial, the district court explicitly discussed the requirements and holdings of *Remmer*, *Bruscino*, and *Sababu*, among other cases, concluding that "[p]rejudice to the defendants is presumed . . . but is rebutted if there is no reasonable possibility that the verdict was affected by the contact." We are confident, in light of these statements, that the court identified the correct legal standard for its inquiry.

**C**

The question remains whether the court abused its discretion in applying the law. In *United States v. Sanders,* 962 F.2d 660 (7th Cir. 1992), we suggested a nonexclusive list of considerations that throw light on the question of prejudice. These factors "include [1] the extent and nature of the unauthorized contact, [2] the power of curative instructions, and [3] the responses of the jury." *Id.* at 669. We will follow that checklist here, understanding, of course, that in the end this type of inquiry simply helps to ensure that neither the district court nor we have overlooked anything important.

As we noted earlier, the AJS article was unrelated to the facts of the case or the defendants' guilt, and thus was less likely to prejudice the jury's evaluation of the central issues in the case. Furthermore, only the jurors who sat on the original jury were exposed to the article, and their exposure was brief.

The district court rejected the defendants' speculation that Peterson "believed this document was some sort of trump card in an ongoing dispute with [Juror] Ezell." The testimony was in conflict about how severe that dispute was: Ezell claimed that she cried after the AJS article was read to the original jury, while Peterson testified that no one responded emotionally at all. The district court concluded that the article "did not sway the course of deliberations" during the first jury's deliberations when it was read, nor (more importantly) did it "play any role in the reconstituted deliberations." In reaching this conclusion, the district court credited Peterson's testimony that Ezell did not change her approach to the deliberative process after the excerpt was read, and Peterson's testimony that she did not refer to the article at all during the reconstituted jury's deliberations. The defense cannot point to any evidence showing that the

district court's conclusions about credibility of the jurors regarding the external information were clearly erroneous.

The district court also concluded that the AJS article "does not state or imply that jurors must reach any decision," and could not "lead a reasonable juror to change his or her determination for fear of punishment." Rather, based on the court's instructions about deliberations, the "jurors may have reasonably believed, even without consulting extraneous material, that they could be removed if they refused to 'deliberate.'" This differs significantly from the situation faced by the Ninth Circuit in *United States v. Rosenthal*, in which a juror asked an attorney friend whether she had "any leeway" in following the court's instructions on the law, and her friend advised her that she "could get into trouble" if she strayed from the instructions, which implies a more severe penalty than simply being removed from a jury. 454 F.3d 943, 950 (9th Cir. 2006).

We now come to what may be the most powerful reason for concluding that Peterson's reading of the paragraph from the AJS article did not prejudice the defendants: it occurred during the deliberations of the initial jury, and the district court took measures to assure that the new jury could and would put Round 1 behind them. After dismissing Ezell and Pavlick, the district court asked each one of the remaining original jurors individually if he or she could disregard the previous deliberations and start over. For example, the court asked one juror, "If I were to tell you that today we are bringing some other jurors back and you must start all over, is that something you think you can do?" and "Could you, do you believe, to the best of your ability, put out of your mind all the discussion that's happened in the last few days with your fellow jurors?" The juror responded, "Yes, I can. Put it over and just start new." The court continued, "Just start as though it never happened before?" The juror replied,

"Yes." The court followed up yet again, "Any concerns about how—the difficulty that that would present for you?" The juror responded, "None whatsoever. I have no problems with it."

We approved a similar manner of proceeding in *Sanders*. There, "[the contacted juror] explicitly testified that she could put this incident behind her and continue to serve impartially as a juror." *Sanders*, 962 F.2d at 670. We concluded that "[b]ecause of this explicit testimony and the careful inquiry of the district court, we are unable to say that the district court abused its discretion in accepting Juror Layton's sworn statements and allowing the trial to continue." *Id. Sanders* compared this situation with "pretrial voir dire," about which "the Supreme Court has held that the test for determining impartiality in a prospective juror is whether he or she can 'lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Id.* at 670, n.10 (quoting *Murphy v. Florida*, 421 U.S. 794, 800 (1975)).

The court did not specifically instruct the remaining jurors to disregard the AJS article (as it had not yet come to light), but still the court trod carefully to avoid prying into the jury's earlier internal deliberations. This is because FED. R. EVID. 606(b) provides that

> [u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

The rule did not technically apply at the time of the new instructions to the remaining jurors, as the jury had not yet reached a verdict. The rule is based, however, on the

"long-recognized and very substantial concerns [that] support the protection of jury deliberations from intrusive inquiry." *Tanner v. United States*, 483 U.S. 107, 127 (1987). The court reasonably took care to abide by the spirit of the rule because the original jurors were going to return as part of the reconstituted jury. If by its inquiry the court sent the implicit message that future deliberations might not be secret, then we would be facing a different set of problems with the reconstituted jury's verdict.

Following the juror interviews, the district court made a precautionary statement to the new jury before instructing it:

> You may have heard by now that two of the original jurors in this case were excused from further jury service. I want you to know, as I've told some of you already, that the circumstances that brought about the fact that these two jurors were excused, *those circumstances were not prompted by any of the lawyers or by the parties in this case, nor by your previous deliberations*, those of you who were here. Rather, the inquiry was generated by members of the media. . . . I want you to know that in attempting to reach verdicts in this case you are answerable only to your own conscious [sic]. It is your job, and your job alone, to find the facts in this case and to apply the law that I have given you. . . . The fact that there have been circumstances that led to two jurors being excused should not in any way enter into your deliberations. . . . [I]t is imperative that you completely put your prior deliberations out of your mind. You must treat this case as if the prior deliberations did not occur. *You also should not discuss or mention any statements or comments made during the prior deliberations when you begin these new deliberations.*

(emphasis added).

There is a general presumption that juries follow their instructions. See, *e.g.*, *Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); see also *United States v. McClinton*, 135 F.3d 1178, 1189 (7th Cir. 1998). This presumption is overcome only if there is an "overwhelming possibility" that the jury was unable to follow the instructions. *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987). Here, it is hard to imagine instructions that would be better tailored to the issue of the AJS article, as well as to the other concerns about the original deliberations that the defendants allege. (The defendants' assertion that some of the jurors believed that they "could force the removal of a fellow juror" also fails in light of these instructions and the court's credibility findings.) During the post-trial proceedings, the district court once again concluded that "the court believes that the jurors who deliberated to verdict in this case were diligent and impartial. . . . They sat attentively through nearly six months of evidence. . . . The court believes these jurors made every effort to be fair, even amid extraordinary public scrutiny." This assessment is entitled to deference from us.

**D**

The defendants make one final argument about the alleged external influences on the jury. They claim that the district court "*acknowledged* presumptive prejudice, [but] it effectively required a showing of *actual* prejudice." We do not see it that way. The defendants are forgetting that there is a middle ground, in which the court finds presumptive prejudice, but it then goes on to find that the government has rebutted that presumption. After interviewing both Ezell and Peterson, the district court stated, "I am comfortable, based upon what I have heard, at least at this point, that the jurors' brief consideration

of that material did not [cause] prejudice." The court did not conclude that the defendants lost because they failed to show actual prejudice, or that it was their burden to do so. It found that the government satisfied *its* burden to show that there was no prejudice, as it is entitled to do under *Remmer*. For all of these reasons, the district court did not abuse its discretion in concluding that the extraneous information at issue did not prejudice the defendants.

### III

At the outset of the trial, the district court empaneled eight alternates to the jury. In the end, most of these alternates were necessary to provide the defendants with a full jury. By the time the trial reached the jury deliberation stage, one juror had been excused for inability to serve—Juror McFadden, who was dismissed on the court's own motion because she had a medical condition that made her repeatedly fall asleep during the trial.

The revelations of the possible criminal records of some of the original jurors led, as we have said, to the district court's decision to excuse Jurors Pavlick and Ezell and to replace them with alternates. Defendants raise five arguments relating to the process of removal and replacement: first, they accuse the district court of misleading defense counsel about the standard that would be used for removing jurors; second, they assert that the court applied an arbitrary standard for dismissals; third, they claim that the prosecution knew that Ezell was a holdout juror for the defense at the time it moved for Ezell's removal; fourth, they speculate that the removal of Ezell chilled pro-defense jurors; and finally, they fear that the investigation into the jurors' backgrounds biased the jurors against the defense.

**A**

The most important question for purposes of this part of the appeal is whether the district court correctly decided to rely on the standard established in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), for assessing these various challenges to the jury. In *McDonough*, the Supreme Court held that an inaccurate answer on a jury questionnaire discovered after the verdict was returned could be grounds for a new trial only if the "correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. Defendants claim that this standard is inappropriate for pre-verdict removals because *McDonough* rested on the need for finality in a given jury's verdict. The implication of their position is that it is actually impossible to remove a juror for cause once deliberations have started. This is not the case, as FED. R. CRIM. P. 24(c)(3) illustrates. Furthermore, most of the interests in finality recognized by *McDonough* have already accrued by the time a fully tried case is submitted to a jury. We can see no sense in a rule that forces the court to sit by idly, knowing that it ought to remove a juror, just so that the jury can return a verdict and the facts of *McDonough* will be replicated. The district court was correct to turn to *McDonough* for guidance on how to resolve the problems that had arisen.

**B**

The next question is whether the district court applied this standard consistently. When the possibility arose that some sitting jurors would need to be removed because of their criminal records, the court asked the attorneys for their thoughts on the standard to apply to possible removals. All attorneys responded with arguments to the court. Less than an hour later, the court

informed counsel that it saw a difference between jurors such as Pavlick and Ezell, for whom there were significant disparities between the questionnaires and their recent criminal histories, on the one hand, and jurors such as Casino, who may simply have forgotten long past criminal histories or may not have understood what was required to be disclosed.

In the end, the district court concluded and repeatedly stated that the appropriate action would be to excuse any juror for whom the newly acquired information would have led to a challenge for cause by one of the parties that the court would have granted. The court announced that it would follow that standard even if the result was to reduce the number of jurors below the number required to reach a verdict. This is precisely what *McDonough* calls for: changing the composition of the jury after the time for peremptory challenges has expired only if the "cause" standard is met. When faced with a post-trial argument about a juror, the Supreme Court has focused on the question whether a district court's ruling "result[ed] in the seating of any juror who should have been dismissed for cause," not on whether some other jury might also have been impartial. *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000).

Before Ezell was dismissed, the district court asked defense counsel if they were accepting its standard. The court again clarified the standard being used, stating that a juror's saying only that she did not understand a question, or a juror acknowledging that she may not have answered everything truthfully, might not be excusable solely for that reason. The government agreed and noted that even if it might have made a challenge for cause, the decision would have been the court's in the end. The defense counsel stated their disagreement "that that's the standard that should be applied," and again expressed a preference for removing any juror "the Court has found . . .

not [to be] truthful." When all was said and done, however, this was just a discussion about how to apply the *McDonough* standard to these facts. The court recognized this: in its order denying defendants' motion for a new trial, it reiterated that it had applied the *McDonough* standard to removing the contested jurors.

Ignoring this extensive exchange, the defendants claim that "the district court never made any findings with respect to any juror that would have constituted a valid challenge for cause." The record does not support that assertion. The dismissal of Ezell provides a good example. After explaining the applicable standard, the district court said, "Let's just start with the use of an alias. I think that probably would have been a basis for cause. . . ." Prior to Ezell's dismissal, the government told the district court that it would have challenged her for cause had it known that "she has an arrest with a false name" because "[h]ow somebody who gives law enforcement officers false information upon an arrest can possibly be an impartial juror in this case, where one of the charges is giving false information to law enforcement officers, is well beyond me." The prosecution added, "Judge, there would not have been a contest" and that it was "[n]ot even an issue" because the government would always challenge for cause under such circumstances. The court responded that "if . . . there would have been a cause challenge, I suspect there would not have been an objection. She would have been excused."

Soon after saying that, the court questioned Ezell about her arrest under a false name and concluded that her response was not forthcoming. As the court put it, "[Ezell] has never told us the truth about the [false] name Thora Jones." After listening to the attorneys' arguments, the court said, "I think she has concealed a great deal of information. And the critical question is, had this ques-

tion been answered, would it have been grounds for cause? I can't imagine that the answer is anything other than yes. I think I have to excuse her." This is enough to convince us that Ezell was removed because she would have been removable for cause. This case is not like *United States v. Harbin*, where the district court told the parties that jurors would be removed only for cause once trial began, but then it allowed the prosecution to use a peremptory challenge to remove a juror during the trial. 250 F.3d 532, 547 (7th Cir. 2001). Based on the lengthy discussions among the court, the prosecutors, and defense counsel, it is apparent that everyone knew that the court was using the *McDonough* standard.

The defendants try to undermine this conclusion by arguing that the prosecution did not raise challenges for cause against all jurors with criminal convictions or family members with extensive criminal histories. To the extent that this is accurate, this argument would sway us only if the government did not challenge jurors with the same types of criminal histories as those who were struck for cause during deliberations. *Cf. Coulter v. McCann*, 484 F.3d 459, 465 (7th Cir. 2007) (reiterating the established principle that when defense counsel claims that prosecutors have used a peremptory strike for an impermissible reason, it is necessary to show a "similarly situated venireperson" who was not struck). In this case, the defense has pointed to no comparable jurors who were not struck. No other juror had committed, as Ezell had, conduct with such significant similarities to the charged conduct at issue in the case.

Pavlick's dismissal during deliberations stemmed from an undisclosed felony DUI conviction during Ryan's tenure as Secretary of State. The Illinois Secretary of State sets many significant drunk driving policies, and this case dealt with locations of the Secretary's local motor vehicles administration facilities that might have con-

nected Pavlick's conviction to Ryan's office. In fact, it appears that there was some action taken by the Secretary of State against Pavlick while Ryan was serving in that office. The conviction, coupled with Pavlick's negative association with Ryan's office, provide ample grounds for dismissal for cause. Even Warner's counsel stated, "[w]e have a real concern with a convicted felon sitting with a deliberating jury for eight days." There was no argument from any attorney before the district court that Pavlick would not have been removed for cause had he been honest during *voir dire*. Also, the only juror with similar convictions to Pavlik's—alternate Masri—was also dismissed. Again, the district court was entitled to remove Pavlick under the *McDonough* standard.

Other jurors also found themselves under the court's scrutiny. Alternate juror Svymbersky failed to disclose a 23-year-old conviction charge for purchasing a stolen bicycle, explaining that he had not thought of it when filling out his questionnaire. The court ultimately believed this explanation. Juror Casino had three arrests (including one conviction) in the 1960s. He too testified that he did not remember these incidents when filling out the questionnaire. The district court remarked after interviewing Casino that "[t]his juror is as credible as any juror I have ever had." The court listened to the attorneys argue about Casino and then said, "somebody who really, truly doesn't remember it and hasn't gotten in any trouble since, it seems to me could hardly have a bias." Juror Rein was arrested in 1980 for assault for slapping his sister, but never appeared in court for the charge and thought that the matter had been expunged from his record. He testified that he did not recall the event when he filled out his questionnaire. By contrast, alternate juror Masri had reported a DUI conviction in 2000 but had not disclosed another DUI conviction in 2004 or that he was on probation in September 2005. The district

court ultimately allowed the defendants' cause challenge against Masri, and we have already noted the similarities between Pavlick's and Masri's criminal records. Although one of Masri's DUI misdemeanor convictions came out during *voir dire*, that one did not occur while Ryan was the Secretary of State, and therefore it is not unreasonable that neither party would have moved to remove him for cause for that conviction alone. Only when it turned out that there were multiple, recent convictions, and that Masri was trying to hide them, did the likelihood that he would have been removed for cause become significant.

Looking at these other jurors (apart from Ezell and Pavlick), we view the district court's conclusion that only Masri could have faced a valid challenge for cause as reasonable. A district court has no obligation to grant a challenge every time it turns out that a venireperson has a criminal record. It has the discretion to determine, based on all the facts, whether dismissal for cause is necessary. *United States v. Ray*, 238 F.3d 828, 937 (7th Cir. 2001). We conclude that the district court applied the *McDonough* standard consistently in considering whether to excuse each of the jurors with undisclosed criminal histories.

**C**

Next we address the defendants' claim that the prosecution knew that Ezell was a defense holdout and that this was the real reason why Ezell was dismissed. The record does not support this contention. Three jurors were dismissed (Pavlick, Ezell, and Masri) after the investigations into their questionnaires. The district court concluded that "I have genuine concerns that Mr. Pavlick and Ms. Ezell . . . may very well have been motivated to get on the jury." Indeed, the strongest cases for challenges for cause were against these two jurors.

We cannot find any basis in the record to conclude that the district court dismissed Ezell because of her view of the evidence or that the prosecution tricked the district court into dismissing Ezell for cause based on its belief about Ezell's view of the evidence. The district court was troubled immediately after Ezell's criminal history was disclosed. We have no doubt that the district court's reasons (which we have already reviewed) for dismissing Ezell for cause were genuine.

Because of this, it does not matter what the prosecution may have suspected about Ezell's views on the evidence in this case. It is the court's actions that count when a decision is within the discretion of the court, not counsel's motivations for supporting or opposing the court's actions. So long as the court was not hoodwinked into believing there was cause where there was none (and it was not), the removal was proper. Without belaboring the point, we note finally that there is no serious basis in the record supporting the defense's speculation that the prosecution somehow knew that Ezell was a "defense" juror and that it was trying to bounce her from the jury for that reason. At best, everyone was guessing. These hunches fall far short of supporting the defendants' argument that the prosecution knew Ezell's view of the evidence, let alone sought her dismissal for that reason.

**D**

The defendants also contend that Ezell's removal "potentially chilled the expression of pro-defense jurors in deliberations." Based on our discussion above, we believe that the instructions that the court gave to the reconstituted jury prevented any chilling of pro-defense views in the new jury. It is also worth noting that the jurors who served on both juries would have recalled that when the court initially received the note about Ezell, it

responded by instructing the jury that "you twelve are the jurors selected to decide this case." This instruction also operated to prevent any potential chilling of pro-defense views (or any other dissenting views). Moreover, the first juror dismissed after that response from the court was Pavlick, who had signed the note, not Ezell.

**E**

The defendants' last argument relating to the jury is that the background checks on jurors that the court ordered when word of the criminal backgrounds hit the media prejudiced the defense. The government rightly points out that the defense asked for many of these checks. Although this comes close to waiving this point for appeal, we are willing to assume that the defense's waiver was not complete. Nevertheless, the district court's specific instructions to the reconstituted jury, as well as its repeated admonitions to avoid media coverage of the trial, precluded any bias against the defense by preventing the jurors from knowing about the extent of the background checks. The defendants' only real support for their argument comes from Juror Losacco's testimony that she was "scared" during her interview. But this trepidation appears to have resulted from the number of lawyers in the room during her interview rather than any feeling that she needed to serve the prosecution's interest or risk punishment. Therefore, we see no abuse of the court's discretion in its decision to call for the background checks.

In summary, the defendants' complaints about the court's handling of the jury are unsupported by the law and the record. The district court properly employed the *McDonough* standard in determining whether jurors should be removed, in determining whether a misstatement was made on the juror questionnaires and the reasons for the misstatement, and in focusing on whether

the undisclosed information would have supported strik-
ing that juror for cause. With careful consideration and
full attention to all counsels' arguments, the district
court applied that standard consistently and openly to
all of the jurors and alternates. The court did not dis-
miss Ezell because she was a "holdout," nor were jury
deliberations chilled because of the way in which Ezell was
removed. Finally, the record suggests no reason to think
that the reconstituted jury was biased against the defen-
dants because of the court's inquiries.

## IV

The defendants next argue that the replacement of jurors
after eight days of deliberations deprived them of their
right to a fair trial before an impartial jury. One major
strike against this argument is the fact that since
its amendment in 1999, FED. R. CRIM. P. 24(c) has al-
lowed for the removal of deliberating jurors. Although the
defendants contend that the government has the burden
of showing that a juror replacement during deliberations
is not prejudicial, this burden allocation is not supported
by the text of Rule 24(c)(3), which states:

> *Retaining Alternate Jurors.* The court may retain
> alternate jurors after the jury retires to deliberate. The
> court must ensure that a retained alternate does not
> discuss the case with anyone until that alternate
> replaces a juror or is discharged. If an alternate
> replaces a juror after deliberations have begun, the
> court must instruct the jury to begin its delibera-
> tions anew.

So long as the two explicit conditions of the rule—ensuring
that the alternate does not discuss the case prior to
replacing an original juror and instructing the jury to
restart deliberations—are satisfied, the decision to re-

place deliberating jurors rests firmly within the district court's discretion.

We have held that "[r]emoving [a] questioned juror and replacing her with an alternate" is reviewed for abuse of discretion. *United States v. Sandoval*, 241 F.3d 549, 552 (7th Cir. 2001). There is nothing in the text of Rule 24(c)(3) to suggest that a different approach is required for reviewing removals that occur during deliberations. The Fifth Circuit employed an abuse of discretion standard for juror removals during deliberations, although it is not clear whether the trial in that case took place before or after the Rule 24 amendment came into force; it concluded that a district court abuses its discretion in the context of juror removal only "if the juror was discharged without factual support or for a legally irrelevant reason." *United States v. Edwards*, 303 F.3d 606, 631 (5th Cir. 2002) (internal quotation marks and citations omitted).

The defendants urge us to rely on cases that pre-date Rule 24's amendment. They argue that we must reverse the conviction if "the record indicates a reasonable possibility of prejudice" from the removal of the juror during deliberations. *United States v. Register*, 182 F.3d 820, 843 (11th Cir. 1999). The flaw in this argument is that *Register* based its holding on "the letter of Rule 24(c)," which at that time stated that "[a]n alternate juror who does not replace a regular juror *shall be discharged* after the jury retires to consider its verdict." *Id.* (emphasis added). The court wrote that the rule "do[es] not apply a *per se* reversal standard to Rule 24(c) violations, [but rather] . . . the harmless error test and reverse[s] . . . only where there is a reasonable possibility that the district court's violation of Rule 24(c) actually prejudiced [the defendant] by affecting the jury's final verdict." *Id.* at 842. Thus, *Register* undertook a prejudice inquiry only be-

cause the district court had no discretion under the old Rule 24(c) to retain alternate jurors.

Under the amended Rule 24(c), the district court has discretion to retain alternates during deliberations. We think it most useful to look to our general approach to Rule 24 to decide whether the court properly removed Ezell and Pavlick. Only where a district court fails to comply with the non-discretionary requirements of Rule 24(c)(3) should our review require a prejudice inquiry like that in *Register*. Otherwise, "if the record shows some legitimate basis for th[e] decision [to replace a juror], there is no abuse of discretion." *United States v. Humphrey*, 34 F.3d 551, 557 (7th Cir. 1994). The defendants have the burden of demonstrating on appeal that there was no legitimate basis in the record for the district court to remove Ezell and Pavlick and replace them with alternates.

The defendants claim that the jurors were incapable of following the court's instructions to begin anew, but we have already rejected that argument. They also point to the fact that the jury had sought and received guidance from the court during its original deliberations, and they charge that the jury "resorted to misconduct in an effort to force the removal of a holdout defense juror," about which we have little more to say. The defendants also refer to unsubstantiated reports in the media that the jury had already deliberated to verdict on several counts to demonstrate that there was no basis in the record for the district court to seat the two alternate jurors.

We have no intention of deciding this case based on anything but what is properly in the record. The only allegation that we need address is the one of jury misconduct, and it is easily rejected. The district court, based on its assessments of the jury's notes to the court, concluded that there was no concerted effort to remove any juror based on her viewpoint. This conclusion, which is sup-

ported by the record, provides all the basis this court needs to affirm the district court's decision to order substitutions of jurors.

The defendants complain that we have no way of knowing whether the jury really started its deliberations anew, as the court told it to do. They also charge that the record reveals a likelihood that empaneled alternate DiMartino discussed the case with outsiders while the first jury's deliberations were ongoing. We have no quarrel with the Eleventh Circuit's practical observation that "the further along deliberations proceed, the more difficult it becomes to disregard them and begin anew." *United States v. Kopituk*, 690 F.2d 1289, 1310-11 (11th Cir. 1982). *Kopituk* also held, however, even before the amendment to Rule 24, that even though

> the jury spent a total of approximately five days deliberating prior to substitution of the alternate . . ., the jurors' individual assurances that they could and would begin deliberating anew, combined with the fact that the jury deliberated for a full week subsequent to substitution of the alternate juror, is sufficient indication that the jurors were able to and did in fact obey the court's extensive instructions regarding their duty to eliminate all prior deliberations from their minds and begin with a clean slate.

*Id.*; see also *Edwards*, 303 F.3d at 631 (dismissing a juror after 11 days of deliberations, although not discussing seating an alternate); *United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir. 1975) (overturning verdict where reconstituted jury deliberated for only 29 minutes). In the case before us, the original jury deliberated for eight days and the reconstituted jury deliberated for ten. As in *Kopituk*, there is nothing here to suggest that the jurors did not obey the court's instructions and begin deliberations anew. Indeed, the reconstituted jury even requested additional instructions from the court on

specific counts in the indictment during its deliberations that the original jury had not sought.

The record also gives no reason to be especially concerned about alternate DiMartino. She testified before being seated that every time someone would approach her about the case while the first jury was deliberating, she would cut them off immediately. When asked by the court if there was anything she had heard that could "interfere with your ability to become—to start fresh with the jury," she replied, "No . . . because, like I said, we never sat down and had a conversation and discussed anything, what they heard or anything. . . . I would just go, 'Please don't talk about it to me,' I said, 'I am still involved.'" As the district court made clear in its denial of defendants' motion for new trial, it found these statements to be credible. We have no reason to second-guess that factual determination.

Rule 24(c) therefore furnishes no basis for a finding that the district court abused its discretion in replacing jurors Ezell and Pavlick with alternate jurors DiMartino and Svymbersky. Defendants have made no showing that this replacement of jurors does not fall squarely within the allowable bounds of the new Rule 24. As they confess in their brief, they seek a holding that "almost any decision to substitute [during deliberations is] prejudicial." This cannot be the proper standard under the new Rule 24(c).

## V

Moving, at last, away from the jury issues, the defendants claim that the district court erred in excluding evidence that showed Ryan's good faith, Ryan's lack of fraudulent intent, and the reasonableness of Ryan's belief about the bona fides of the transactions at issue in

this case, including those that involved Warner. We review a district court's evidentiary decisions for abuse of discretion. *United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005). Mail fraud is a specific intent crime, and so defendants are entitled to introduce evidence of good faith or absence of intent to defraud. *United States v. Longfellow*, 43 F.3d 318, 321 (7th Cir. 1994). This court, however, "do[es] not require that any evidence, no matter how tangential, irrelevant or otherwise inadmissible, must be admitted simply because the defendant claims that it establishes his good faith." *Id.* at 321-22.

## A

The first evidentiary dispute arose when Ryan wanted to introduce evidence to the effect that his successor as Secretary of State, Jesse White, had renewed some of the leases and contracts at issue here. The district court excluded this evidence as irrelevant. It reasoned that "the naked act of some other official, whether he preceded or followed Ryan in office, does not shed any light on what Ryan himself intended when he took that same act, absent evidence that Ryan actually considered the official's act." It continued, "[t]he decision to renew a lease is, moreover, one influenced by many factors other than the decision to enter into a lease in the first place." The question for us is whether this decision was an abuse of the district court's discretion.

Many of the leases at issue here involved property for long-term operations, such as DMV locations and a police department office. These are not the type of facilities that the state can pack up every few years and move just because rent is slightly cheaper a few blocks away. Thus, a later administrative decision to renew such a lease shows only that the lease is not so disadvantageous

to the state that it outweighs the costs that would be required to move to a new location. It sheds no light on whether the original lease or contract was proper.

In making its determination, the district court was not applying any sort of "inflexible rules." In *Riordan v. Kempiners*, one of the cases the defendants cite, the district court had drawn a line in time and prohibited all evidence that developed after a specific date. 831 F.2d 690, 698 (7th Cir. 1987); see also *CERAbio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 993 (7th Cir. 2005) (holding that evidentiary exclusions should be made based on the substantive value of the evidence rather than the date of the evidence). The district court's ruling here, in contrast, was based on the substance of the evidence that would be offered and the court's evaluation of the probative value of that evidence.

The limited nature of the district court's ruling becomes even more evident when one sees that it did not even apply to all evidence post-dating the leases and contracts. Both the prosecution and defense provided experts to assess the soundness of the contracts and leases at issue in this case. The government's expert offered only a retrospective analysis of the extent to which some of the subject leases reflected fair market value. The defense expert, in contrast, appears to have based his opinion in part on an analysis of leases and properties that were not available until years after the leases at issue were awarded.

Defendants therefore had the opportunity to justify the contracts and leases at issue using economic analysis and expert testimony; they were not deprived of the opportunity to assess these deals with the benefit of hindsight. This means as well that the defense was not arbitrarily foreclosed from putting forth relevant evidence, the error criticized in *CERAbio*, 410 F.3d at 994.

The defendants' argument that prosecution witness Glen Good's testimony unfairly crossed some temporal line fails because there was no such line. The proper comparison, in any event, is not between Good's testimony and evidence that Secretary White renewed the leases. It is between Good's testimony and the defendants' evidence about lease decisions and the results of those decisions during Ryan's tenure as Secretary of State. Good, who was in charge of property maintenance during Ryan's term in office, testified about the soundness of particular lease decisions during Ryan's tenure. Good's testimony also rebutted the argument that Ryan made lease decisions only on the basis of recommendations from his staff. Ryan was free at trial to introduce evidence about his decision-making process for the leases and contracts in question, and he took advantage of that opportunity. The defense was also allowed to cross-examine Good extensively (over the government's objection) about the information he omitted from his reports about certain various properties at issue in this case.

It is conceivable that another court would have reached different conclusions about the relevance of this excluded evidence, but that does not mean that the district court abused its discretion here. We conclude that its ruling was one that it reasonably could have made, that it was not a result of arbitrary line-drawing, and thus that it did not give rise to reversible error.

**B**

The district court used a similar rationale to exclude evidence of rate increases made by other Illinois Secretaries of State. The defendants claim that the district court "refused to admit defense evidence showing that such rate increases were a regular practice of the SOS." This mischaracterizes the district court's holding. The specific

rate increases by other officials were excluded where they played no role in Ryan's rate increase. The court allowed Ryan to introduce evidence that his predecessor (and his predecessor's advisors) recommended a rate increase as overdue, but held off on the increase for election reasons. This type of evidence is arguably probative because it provides support to Ryan's contention that the increase was a sound policy decision. See *Longfellow*, 43 F.3d at 322.

The defendants claim that the rate hikes approved by other Secretaries of State were "evidence of the routine practice of [an] organization[ ]" and should have been allowed as evidence under FED. R. EVID. 406. A "routine practice," however, requires more repetition and mechanization than the occasional rate decisions here displayed. See Advisory Committee Notes for Rule 406 (emphasizing the need for a "repeated specific situation" before something qualifies as "habit"). The Note comments that "[e]quivalent behavior on the part of a group is designated 'routine practice of an organization' in the rule." The practice that the defense wanted to demonstrate here was not the type of "regular response to a repeated specific situation" required for admission under Rule 406. Here again, we conclude that the district court did not abuse its discretion by excluding the proffered evidence.

## C

Finally, the defendants challenge the exclusion of certain policy decisions that Ryan made while in office. The defense argues that "the prosecution attacked Ryan at trial as [a] 'greedy,' 'shameless' politician who treated his public offices as 'personal kingdoms' in which he was 'pillaging the state, stealing from the taxpayers' in breach of the public's trust." Ryan, they argue, was entitled to an opportunity to correct this impression. If these quotes

had come from the government's case-in-chief, then they might have a point. But they did not. The quoted statements come from the prosecution's closing argument. The government did not use evidence of Ryan's general dishonesty in its case-in-chief; it focused on the bad faith associated with the criminal acts charged in this case. The district court permitted Ryan to introduce evidence of many of his policy accomplishments and goals. It also allowed him to call numerous character witnesses, who testified about such achievements as strengthened drunk driving laws, improvements in the state library system, the development of an organ donor registry, and reform of Illinois's death penalty laws. The government's closing argument was therefore an allowable response.

The defendants also point to a particular government witness, Patrick Quinn, whom the defense sought to impeach through his opposition to Ryan's death penalty work. The district court was prepared to allow the defense to impeach Quinn, but it was willing to permit reference only to a "public policy" disagreement, not to the death penalty. Ryan chose not to impeach the witness. The defendants have not shown how they were prejudiced by this limitation.

In a more general argument, the defendants contend that had the jury been able to view the charged acts alongside the excluded evidence of Ryan's policy work, it would have seen that the evidence overall "did not fairly indicate the existence of a scheme to defraud." *Worthington v. United States*, 64 F.2d 936, 942 (7th Cir. 1933). The link between the excluded evidence and the charged acts, however, is not so direct.

Had it existed, evidence that Ryan steered leases or contracts away from his financial benefactors might have cast some doubt on the existence of the conspiracy and scheme charged. But Ryan's work on issues of importance

to the public, such as the death penalty, important
and admirable though it may have been in many people's
eyes, does nothing to show that Ryan was not at the same
time accepting financial benefits in exchange for other
specific, official actions. So long as the government did
not allege specifically that *all* of Ryan's acts as Governor
were for his own financial gain, the district court was
within its rights to exclude discussion of various official
acts that were wholly disconnected from the charges
in this case. Courts have held that excluding evidence of
satisfied customers is not an abuse of discretion in cases
charging a defendant with a fraudulent scheme. See, *e.g.*,
*United States v. Elliott*, 62 F.3d 1304, 1308 (11th Cir.
1995). Excluding evidence of activities even further
removed from the charged acts is not an abuse of discre-
tion either.

## VI

In the next part of their appeal, the defendants raise
a question of law: is it permissible for the government to
charge and prove the State of Illinois itself is an "enter-
prise" for RICO purposes, and secondarily, did the dis-
trict court err when it instructed the jury that the State
of Illinois is a "legal entity." We consider these argu-
ments in turn.

## A

The question whether a state may be an "enterprise" for
purposes of a RICO prosecution is one of first impression.
The defendants' first reason for arguing that it cannot
be relies on the remedies allowed under RICO. The
statute provides for remedies including court-ordered
"dissolution or reorganization of any enterprise," 18 U.S.C.
§ 1964(a). Since it is obvious that no court would have the

power to disband a sovereign state, the defendants argue that the remedial provisions of the law implicitly mean that the state cannot be a RICO enterprise.

The only problem with this attack is that the Supreme Court rejected it long ago:

> Even if one or more of the civil remedies might be inapplicable to a particular illegitimate enterprise, this fact would not serve to limit the enterprise concept. Congress has provided civil remedies for use when the circumstances so warrant. It is untenable to argue that their existence limits the scope of the criminal provisions.

*United States v. Turkette*, 452 U.S. 576, 585 (1981). RICO provides a menu of remedies; it does not matter if one or more of the items on that menu might be unavailable in a particular case. Instead, what is important, according to *Turkette*, is that Congress meant the term "enterprise" to be "inclusive." 452 U.S. at 586.

This court has held that other public bodies, which similarly cannot be dissolved, may be the "enterprise" through which a RICO conspiracy or operation proceeds. See, *e.g.*, *United States v. Murphy*, 768 F.2d 1518, 1531 (7th Cir. 1985) (the Circuit Court of Cook County); *United States v. Lee Stoller Enters., Inc.*, 652 F.2d 1313, 1318-19 & n.9 (7th Cir. 1981) (*en banc*) (RICO enterprise can be a public body, citing cases). We conclude that for purposes of defining a RICO "enterprise" there is no difference between the state and its subdivisions.

The defendants next argue that comity interests prevent the use of a state as a RICO enterprise in a criminal case. The only court to consider directly whether a state can be a RICO enterprise was the District Court of Maryland. *United States v. Mandel*, 415 F. Supp. 997 (D. Md. 1976). The defendants urge us to accept the reasoning

in *Mandel*, which found that the State of Maryland was not a RICO enterprise in the prosecution of a Maryland governor. 415 F. Supp. at 1021. District court opinions have no authoritative effect on this court, so we look to the analysis of district courts only to inform, rather than instruct, our decisions. *RLJCS Enters. v. Prof'l Benefit Trust Multiple Employer Welfare Benefit Plan & Trust*, 487 F.3d 494, 499 (7th Cir. 2007).

It is enough to note that *Mandel* did not limit its analysis to states as potential RICO enterprises. The district court there expressed concern about the possibility of finding that *any* public entity was a RICO enterprise. 415 F. Supp. at 1020. Since *Mandel* was decided, the Fourth Circuit has criticized its analysis on several occasions. *United States v. Long*, 651 F.2d 239, 241 (4th Cir. 1981); *United States v. Altomare*, 625 F.2d 5, 7 (4th Cir. 1980); *United States v. Baker*, 617 F.2d 1060, 1061 (4th Cir. 1980). In each of these cases, the Fourth Circuit explicitly rejected the rationale of *Mandel*. *Long*, for example, referred to *Altomare* and *Baker*, noting that "[i]n two recent RICO cases . . . we have indicated our disapproval of that [*Mandel*] decision. We have held, in accord with the majority of the cases, that RICO should be construed to include public entities as enterprises." 651 F.2d at 241.

*Long* justified the use of major governmental entities as RICO enterprises in indictments, stating that "[n]either the Act nor the courts' interpretation of it support the contention that its enforcement threatens the discretion state officials must exercise in the discharge of their duties[, but instead] . . . [t]he Act sustains, rather than threatens, the integrity of the South Carolina Senate," which was the named RICO enterprise in that case. 651 F.2d at 241. Our sister circuits have reached similar conclusions about the use of governmental entities as

RICO enterprises. See, *e.g.*, *United States v. Angelilli*, 660 F.2d 23, 33 (2d Cir. 1981) ("[W]e view the language of § 1961(4), defining enterprise, as unambiguously encompassing governmental units, and we consider that the purpose and history of the Act and the substance of RICO's provisions demonstrate a clear congressional intent that RICO be interpreted to apply to activities that corrupt public governmental entities."); *United States v. Frumento*, 563 F.2d 1083, 1091 (3d Cir. 1977) (comparing the Commonwealth of Pennsylvania to a major corporation and concluding that if the RICO enterprise concept does not reach governmental entities, then "private business organizations legitimately owned and operated by the states . . . would be open game for racketeers"); *United States v. Freeman*, 6 F.3d 586, 597 (9th Cir. 1993) ("We adopt the view of seven circuit courts and hold that a governmental entity may constitute an 'enterprise' within the meaning of RICO.").

The decision that came closest to addressing the issue at hand is the Sixth Circuit's *en banc* opinion in *United States v. Thompson*, 685 F.2d 993 (6th Cir. 1982). There the court held that "The Office of the Governor" could be the enterprise in a RICO prosecution. *Id.* at 998-1000. The court supported its conclusion as follows:

> It seems clear to us that those who played the leading roles in the enactment of the RICO statute thoroughly understood organized crime's impact upon government entities. Senator McClellan, the chief sponsor of this bill and chairman of the committee which drafted it, said: "To exist and to increase its profits, Mr. President, organized crime has found it necessary to corrupt the institutions of our democratic processes, something no society can tolerate." Further, he said, "For with the necessary expansion of governmental regulation of private and business activity, its power to corrupt has given organized crime greater control

> over matters affecting the everyday life of each citizen."
>
> . . .
>
> Representative St. Germain told the House that "the greatest danger from organized crime lies not in its provision of illegal goods and services, but in its penetration of the country's legitimate institutions."

*Id.* at 1000 (internal citations omitted).

The Sixth Circuit noted its concern that an indictment naming the governor's office as a RICO enterprise could be unnecessary and disruptive in some cases, and it recommended that prosecutors should try to avoid such charges in the future if possible. The court suggested that a modified indictment might work better in similar, future cases, based on the RICO definition of "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* (quoting 18 U.S.C. § 1961(4)). The court stated that "the language which could and we believe preferably should have been employed, would have alleged that the three defendants constituted a 'group of individuals associated in fact although not a legal entity which made use of the Office of Governor of the State of Tennessee' for the particular racketeering activities alleged in the indictment." *Thompson*, 685 F.2d at 1000.

We endorse the Sixth Circuit's call for caution. We also agree with the Sixth Circuit's ultimate conclusion that the prosecution's approach to this issue in cases such as *Thompson* and the case at hand may often not be absolutely necessary under RICO, but it is not forbidden. Some cases, however, are exceptional, and ours is one of them. In such a case, the prosecution may have no real alternative to naming the state as the RICO

enterprise. (This of course does not mean that the state itself has violated any federal law; it may instead be a victim of the overall scheme, as are many RICO enterprises.) In such a case, the use of the state as the RICO enterprise in the indictment is analogous to the courts' treatment of the state as a market participant in a dormant commerce clause case. If the CEO of a major corporation, who ascended to that position from other senior executive positions, engaged in comparable activities, we would not only accept but expect a RICO conspiracy indictment with the corporation itself named as the RICO enterprise, even knowing that the overwhelming majority of employees, shareholders, and consumers of the corporation were innocent of wrongdoing. The situation here is the same.

In this case, the prosecution thought that it had identified an ongoing scheme to defraud the State of Illinois through the illegal use of two of the most significant executive branch offices of the state and of the state's electoral processes during Ryan's campaign for Governor in 1998. The scheme revolved around an elected official throughout his tenure in these two offices—Secretary of State and Governor—and during the time he was a candidate for the latter office. No legal rule prohibited the prosecution from concluding that there was no single entity or office that it could have identified, short of the state as a whole, that would have encompassed the enterprise that was used by the defendants. In these unusual circumstances, comity interests do not override the broad language of RICO, as interpreted in *Turkette*. The district court did not err by allowing the state to be the RICO enterprise in this RICO conspiracy prosecution.

**B**

We now turn to the district court's instructions to the jury on the question of the state as a RICO enterprise. All the district court said was that the State of Illinois is a "legal entity." Whether that is correct or not is a question of law, and as such, it was not one that could have been left for the jury to decide. See *United States v. Lee*, 439 F.3d 381, 388 (7th Cir. 2006) (upholding the district court's inclusion of a definition of "organization" in its instructions where the statute required that "the Government must prove . . . that the defendant uttered or possessed a counterfeit and forged security of an organization"). The district court told the jury that the government had to prove three things, including that the State of Illinois was an enterprise. Some "persons" (legal or real) may be "entities," but they still may not meet the statutory definition of "enterprise." See, *e.g.*, *Turkette*, 452 U.S. at 582 (examining the characteristics of a criminal structure to determine whether it was an "enterprise" under RICO). Nevertheless, because governmental or public entities fit within the definition of "enterprise" for purposes of RICO, this court has often rejected objections to jury instructions that a governmental entity is an "enterprise." See *United States v. Hocking*, 860 F.2d 769, 778 (7th Cir. 1988) ("In light of our clear precedent, appellant's claim that the district court erred in instructing the jury that the IDOT is an 'enterprise' within the reach of § 1962(c) is rejected."); see also James Morrison Mecone *et al.*, *Racketeer Influenced and Corrupt Organizations*, 43 AM. CRIM. L. Rev. 869, 881 (2006) ("When the enterprise under consideration is a legal entity, the enterprise element is satisfied by the mere proof that the entity does in fact have a legal existence."). We conclude, therefore, that the district court did not err when it accurately informed the jury that the State of Illinois is a legal entity.

## VII

The next argument that Warner and Ryan present is that the term "intangible right to honest services" in the mail fraud statutes under which they were convicted, 18 U.S.C. §§ 1341 (basic mail fraud), 1346 (definition of "scheme or artifice to defraud" includes deprivation of intangible right to honest services), is unconstitutionally vague. The district court's instructions to the jury, they continue, "mirrored" this vagueness.

The constitutionality of a statute is an issue of law that is reviewed *de novo. United States v. Hausmann*, 345 F.3d 952, 958 (7th Cir. 2003). The defendants acknowledge that this court recently upheld the constitutionality of the "intangible right to honest services" term in the federal mail fraud statute. *Hausmann*, 345 F.3d at 958. The constitutionality of § 1346 has repeatedly been challenged, and every circuit to address this issue has upheld it, even though the rationales have differed. See, *e.g.*, *United States v. Rybicki*, 354 F.3d 124, 132 (2d Cir. 2003) (*en banc*); *United States v. Bryan*, 58 F.3d 933, 941 (4th Cir. 1995); *United States v. Gray*, 96 F.3d 769, 776-77 (5th Cir. 1996); *United States v. Brumley*, 116 F.3d 728, 732 (5th Cir. 1997) (*en banc*); *United States v. Frost*, 125 F.3d 346, 370-71 (6th Cir. 1997); *United States v. Frega*, 179 F.3d 793, 803 (9th Cir. 1999); *United States v. Welch*, 327 F.3d 1081, 1109 n.29 (10th Cir. 2003); *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995). There have been dissenting opinions in two circuits' opinions on this issue. *Rybicki*, 354 F.3d at 162-64 (Jacobs, J., dissenting); *Brumley*, 116 F.3d at 742-47 (Jolly & DeMoss, JJ., dissenting) (objecting to the statute only as applied in that case).

Given this unanimity on the central point, our concern here is only with the question whether the district court's instructions properly reflected this court's approach to the details of the claim. Previous holdings on

this issue are not necessarily dispositive because "vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Powell*, 423 U.S. 87, 92 (1975). "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Posters 'N' Things, LTD v. United States*, 511 U.S. 513, 525 (1994). If the defendants could not have known that the conduct underlying their convictions could be considered "depriv[ing] another of the intangible right of honest services," 18 U.S.C. § 1346, then the statute is void for vagueness as applied here.

In *Hausmann*, we held that

> under the intangible-rights-theory of federal mail or wire fraud liability, a valid indictment need only allege, and a finder of fact need only believe, that a defendant used the interstate mails or wire communications system in furtherance of a scheme to misuse his fiduciary relationship for gain at the expense of the party to whom the fiduciary duty was owed.

345 F.3d at 956. In *United States v. Bloom*, we similarly concluded that "[m]isuse of office (more broadly, misuse of position) for private gain is the line that separates run of the mill violations of state-law fiduciary duty . . . from federal crime." 149 F.3d 649, 655 (7th Cir. 1998). The opinion continued, "[a]n employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain." *Id.* at 656-57.

In the present case, we are facing the same type of conduct that was before the court in *Hausmann* and *Bloom*. The defendants claim that the jury instructions

in this case contradicted the holdings in those two cases, but we disagree. Those cases do not require the jury to find a violation of a specific state law in order to convict. The court told the jury that "the government [must] prove[ ] beyond a reasonable doubt that the public official accepted the personal financial benefits with the understanding that the public official would perform or not perform acts in his official capacity in return." The court continued that the receipt of "personal or financial benefits . . . does not, standing alone, violate the mail fraud statute. . . . Instead that receipt violates the law only if the benefit was received with the public official's understanding that it was given to influence his decision-making." The court also told the jury that "[n]ot every instance of misconduct or violation of a state statute by a public official or employee constitutes a mail fraud violation."

The portion of the jury instructions quoted by the defendants about "conflict of interest" is taken out of context, as the jury instructions explicitly stated that a conflict of interest violated the statute only "if the other elements of the mail fraud statute are met." The district court explained that the government must also show that the public official allowed or accepted the conflict of interest with the understanding or intent that she would perform acts within her official capacity in return.

We are unpersuaded that the references to state law in the jury instructions were phrased in a way that makes the use of the mail fraud statute here unconstitutional. Many of the state law provisions in the instructions explained what kinds of financial transactions are not prohibited for state officials. This explanation was more likely to undermine than to assist the prosecution in showing the defendants' intent to deprive Illinois citizens of Ryan's honest services. The other cited provisions of Illinois law identified for the jury various ways

in which a public official could "misuse his fiduciary relationship," but the instructions as a whole unambiguously required the prosecution to prove that misuse of the office was intended for personal gain, as *Bloom* and *Hausmann* held.

We also note that this court in *Bloom* did not call the relevant section of the mail fraud statute a "common-law federal crime[ ]," as defendants suggest. It merely analogized this section to common law crimes on the way to concluding that the "intangible right" term needs clear boundaries. 149 F.3d at 656. A court's interpretation of a term in a federal criminal statute does not create a federal common law crime.

Although the intangible rights theory of federal mail fraud may have its problems when applied to other fact settings, it is not unconstitutionally vague as applied here. The district court here focused the jury on the important points needed for conviction, and in so doing, gave instructions consistent with *Hausmann* and *Bloom*.

## VIII

We turn, now, to Warner's assertion that the court erred by permitting the joinder of his trial with Ryan's and denying his motion for severance. This court has construed FED. R. CRIM. P. 8, which governs joinder in criminal trials, "broadly to allow liberal joinder in order to enhance judicial efficiency." *United States v. Stillo*, 57 F.3d 553, 556 (7th Cir. 1995). We have repeatedly stated that "joint trials are beneficial not only for efficiency but because they limit inconvenience to witnesses, avoid delays in bringing defendants to trial, and allow the 'total story' to be presented to a single jury." *Id.* at 557. We review misjoinder claims *de novo. United States v. Lanas*, 324 F.3d 894, 899 (7th Cir. 2003).

**A**

Joinder is proper, under Rule 8(b), if the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Under the rule, "[t]he defendants may be charged in one or more counts together or separately"; all defendants "need not be charged in each count." Rule 8(b) is satisfied when the defendants are "charged with crimes that well up out of the same series of such acts, but they need not be the same crimes." *United States v. Pigee*, 197 F.3d 879, 891 (7th Cir. 1999), see also *United States v. Stewart*, 433 F.3d 273, 314 (2d Cir. 2006); *United States v. Eufrasio*, 935 F.2d 553, 567 (3d Cir. 1991). "[T]he mere fact that two conspiracies have overlapping memberships will not authorize a single indictment if the conspiracies cannot be tied together into one conspiracy, one common plan or scheme," but a "conspiracy and its cover-up are parts of a common plan." *United States v. Velasquez*, 772 F.2d 1348, 1353-54 (7th Cir. 1985).

Whether there was an error in joining a defendant is determined by looking only at the indictment. *Lanas*, 324 F.3d at 899. In this case, the final indictment contained 22 counts. Count One was the RICO conspiracy for which both Warner and Ryan were charged. Count Two was the mail fraud scheme, which is listed in Count One as a racketeering act and a means and method of the RICO conspiracy; again, it charged both Warner and Ryan. Of the remaining 20 counts, both were charged in six (Counts Three, Four, Five, Seven, Eight, and Nine), Ryan alone was charged in ten (Count Six, Counts Ten through Thirteen, and Counts Eighteen through Twenty-Two), and Warner alone was charged in four (Counts Fourteen through Seventeen). (The defendants were acquitted on Counts Nine and Ten.)

Examining the indictment, we see that both defendants were charged in the RICO conspiracy and the mail fraud scheme, the two primary courses of conduct charged in the indictment. The mail fraud scheme was also part of the RICO conspiracy. In *Velazquez*, the court found misjoinder of one count because "[t]he indictment does not relate those charges to any of the charges against the other defendants named in the indictment, and the defect is not merely a technical oversight in pleading." *Velasquez*, 772 F.2d at 1353. By contrast, in this case, all of the conduct in Counts One through Seventeen relates to the charges in either the RICO conspiracy, mail fraud scheme, or both, which are charged against both Warner and Ryan.

The only charges unconnected to these two schemes appear in Counts Eighteen to Twenty-Two, Ryan's tax fraud charges. This court has held that "[j]oinder of a tax evasion count is appropriate when it is based upon unreported income flowing directly from the activities which are the subject of the other counts." *United States v. Anderson*, 809 F.2d 1281, 1288 (7th Cir. 1987). The tax fraud scheme charged in Count Eighteen was specifically related to Ryan's campaign committee "Citizens For Ryan." The factual allegations in Count Eighteen recount Citizens For Ryan's diversion of funds to pay for Ryan's and his family's personal expenses, "thereby depriving the IRS of accurate information as to his true income." The allegations of Count One, the RICO conspiracy charge, state that Ryan was obligated by law to report on his federal and state tax returns all expenditures by Citizens For Ryan that were made for personal expenses. Count One also states that part of the *modus operandi* of the RICO conspiracy was the provision of "personal and financial benefits to, and for the benefit of, defendant Ryan, Ryan family members, third parties affiliated with Ryan, and Citizens For Ryan . . . for the

purpose of influencing and rewarding Ryan in the exercise of Ryan's official authority." From the language of the indictment, we can see that the tax fraud scheme and the RICO conspiracy scheme are part of "the same series of acts or transactions, constituting an offense or offenses." FED. R. CRIM. P. 8(b). Many of the same underlying facts—the movement of funds through Citizens For Ryan, for example—are necessary to prove both claims. All of this is enough to explain why we find no improper joinder of the charges against Warner with those against Ryan.

**B**

Because joinder was proper under Rule 8(b), Warner must show that he has suffered from "prejudicial joinder," which is distinct from misjoinder. "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." FED. R. CRIM. P. 14(a). In order to prevail on his argument that the district court erred in denying his motion for severance under FED. R. CRIM. P. 14(a), it is necessary (though not sufficient) for Warner to show prejudice. *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993); see also *United States v. Souffront*, 338 F.3d 809, 831 (7th Cir. 2003) (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)). "Limiting instructions . . . often will suffice to cure any risk of prejudice," and tailoring relief from prejudice is left to the district court's discretion. *Zafiro*, 506 U.S. at 539-41. Where joinder of defendants was proper, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a

reliable judgment about guilt or innocence." *Id.* at 539. "Actual prejudice" does not exist just because "separate trials would have given a defendant a better opportunity for an acquittal." Rather, the defendant must have been "deprived of his right to a fair trial." *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002). The denial of a motion for severance is reviewed for abuse of discretion. *Id.*

Warner argues he suffered prejudice because the joinder violated his substantial rights in multiple ways. He objects first to the fact that his case was linked at all with Ryan's, but this argument goes nowhere, as the indictment demonstrates that the charges against him were closely connected with those against Ryan. Had he been tried separately, he would not have enjoyed the status of "an unknown businessman," as he suggests; he would have still faced charges as a co-conspirator that centered around the activities of the former Governor. Therefore, Warner cannot show that the publicity around Ryan's trial affected his substantial rights in this case.

Next, Warner alleges that Ryan's out-of-court statements to the FBI were testimonial and therefore his constitutional right to confrontation was violated. These statements were not admitted for the truth of the matter asserted, however, and therefore are not hearsay and do not implicate the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004). There was also no *Bruton* issue, because the statements admitted at trial were not inculpatory and did not amount to a confession from Ryan. *Bruton v. United States*, 391 U.S. 123, 127 (1968). The district court excluded the statements that it viewed as potentially inculpatory, including all of Ryan's statements to the FBI naming Warner except those with innocuous or uncontested references.

Warner also contends that significant portions of the evidence introduced against Ryan could not have been

introduced against him in his own trial. The record does not bear this out. Much of the evidence with which Warner takes issue described acts that were part of the conspiracy charged against both defendants in Count One or the scheme charged against both defendants in Count Two. "[E]vidence of one participant's actions in furtherance of a scheme to defraud is admissible against the other participants in that scheme, just as it is in a conspiracy case." *United States v. Adeniji*, 221 F.3d 1020, 1027 (7th Cir. 2000).

The only significant evidence that was unrelated to the charges against Warner was some evidence pertaining to Ryan's tax fraud scheme. Yet even these acts derived from a common set of facts that made up the RICO conspiracy and mail fraud scheme. Therefore, much of the evidence of "a decade of state business, as well [as] . . . Ryan's lifestyle and personal and political campaign finances," was properly part of the evidence that was admissible against Warner because of Counts One and Two. For these reasons, the district court's denial of Warner's proposed limiting instruction for the tax counts was appropriate. The tax evidence relating only to Ryan was minor compared to the evidence presented to show the conspiracy and mail fraud scheme. The district court did not abuse its discretion in curing any possible prejudice from joinder through limiting instructions rather than severance. See *Zafiro*, 506 U.S. at 539.

Finally, Warner argues that the jurors were not following the court's instructions generally and therefore the limiting instructions were ineffective. We are reluctant to call into question the institution of the jury in this way. As we said in *United States v. Hedman*, we may examine "whether it is within the jury's capacity, given the complexity of the case, to follow admonitory instructions and to keep separate, collate and appraise the evidence relevant only to each defendant" in considering

whether severance was improperly denied. 630 F.2d 1184, 1200 (7th Cir. 1980) (internal quotation marks omitted). Nothing in this record convinces us that this jury was either unable or unwilling to follow the careful instructions that the district court gave. Warner does not claim that there was insufficient evidence to convict him on any of the charges against him (although we note the district court threw out Ryan's convictions on two counts for insufficiency of the evidence).

We conclude that Warner has not shown actual prejudice resulting from the joinder of his case with Ryan's. To the extent that there was a risk of prejudice, the district court took appropriate steps to exclude evidence, restrict the use of evidence, and provide specific limiting instructions to the jury. It did not abuse its discretion under Rule 14(a) by denying Warner's motion for severance.

## IX

Finally, Ryan alone also asks this court to hold that it was error to compel the former chief legal counsel in the Secretary of State's office to provide grand jury testimony about his work with then-Secretary of State Ryan. This compelled testimony, Ryan argues, violated his attorney-client privilege. We decline to consider this issue for two reasons. First, Ryan has failed to demonstrate what legally cognizable prejudice he suffered from that decision. It is also not clear what relief he is seeking for this alleged infringement of the privilege. Generally, a defendant challenging an indictment seeks to have the indictment dismissed, but the relief Ryan seeks in this appeal is a new trial. This would do nothing to correct an error in the indictment. The Supreme Court has held that a

> petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the

defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt . . . [and therefore] any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*United States v. Mechanik*, 475 U.S. 66, 69 (1986). Ryan suggests no reason why this general rule should not apply here. Even in cases where indictments can be dismissed, a court "may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).

Ryan states in his brief that he "re-raise[s] the issue here to preserve it for further review." While parties are free to make a limited argument in order to preserve the issue for further review, they must say something to allow this court to consider the argument on its merits, even if they have every expectation that we will reject it. Ryan has not developed this point enough for us to give it meaningful consideration; we thus consider it waived. See *United States v. Jones*, 224 F.3d 621, 626 (7th Cir. 2000).

Second, this court has already spoken on this point. Ryan was entitled to and did appeal the district court's determination in 2001 that the attorney-client privilege did not attach to his communications with the chief legal counsel in the Secretary of State's office. *In re Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir. 2002). We considered and rejected this argument at that time. *Id.* at 295. That is the law of the case, and Ryan has given us no reason to deviate from it. See *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1291 (7th Cir. 1992). We acknowledge that the Second Circuit, in a different case involving communications between a governor and his counsel, has concluded that the privilege

applies. See *In re Grand Jury Investigation*, 399 F.3d 527, 535 (2d Cir. 2005). The Second Circuit acknowledged the tension between its holding and the decisions of three other circuits, including our court's 2002 decision. 399 F.3d at 533 (noting contrary decisions from the Seventh, Eighth, and D.C. Circuits); see generally *In re Lindsey*, 332 U.S. App. D.C. 357, 158 F.3d 1263 (D.C. Cir. 1998); *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997). As matters now stand, three other circuits have weighed in on this issue, two of which agree with us. Even apart from law-of-the-case considerations, we respectfully decline to re-open that issue here.

# X

We conclude with two final comments about this appeal. First, like all defendants who appeal their convictions, Ryan and Warner have presented certain arguments to this court, and they have elected not to present other arguments. At oral argument, there was some discussion of the argument that our dissenting colleague has emphasized—an argument that they chose not to raise: the allegation that members of the jury may have had too much freedom of movement and too much unsupervised time together, during which the opportunity to engage in premature discussions of the case may have arisen. Compare *United States v. Dellinger*, 472 F.2d 340, 373-74 & n.50 (7th Cir. 1972) (emphasizing need for thorough *voir dire* in presence of extensive pretrial publicity). Jury control measures, however, lie within the discretion of the district court judge; this is not an area in which a decision not to sequester, or a decision to permit jurors to walk around unsupervised, triggers such a strong presumption of error that we would have to reverse on that basis even in the absence of *both* (1) any objection at trial and (2) any complaint on appeal. See *Recuenco*, *supra.*

District courts have no duty to "sequester the jury. . ., *sua sponte*, in every case involving prejudicial publicity." *Margoles v. United States*, 407 F.2d 727, 732 (7th Cir. 1969). There is no presumption or rule that sequestration is ever necessary, although we do not dispute that it is a good idea in some high-profile cases, and may well have been the better course here. See *United States v. Carter*, 602 F.2d 799, 808 (7th Cir. 1979) (Tone, J., concurring) (noting this and suggesting such a rule may be preferable). Our opinion, then, should not be taken as necessarily approving of the practices the district court adopted for this case; on the other hand, without the proper objections and briefing, it would be improper for us even to reach the question of plain error arising from the lack of sequestration or tighter controls on the jury's activities. Managing a jury for a trial that spans six months is not easy. We can only emphasize that if any party has an objection to the way the district court is handling that challenge, it has an obligation to raise it, preferably early enough in the proceedings that the court can take prompt corrective measures. If Warner and Ryan believe that their counsel rendered constitutionally ineffective assistance by opting not to raise certain issues on appeal, they may raise that argument in post-conviction relief proceedings.

Our colleague in dissent believes that "there is a structural error because of the jurors' irreconcilable conflicts of interest that resulted from the jury questionnaire situation," specifically, the investigation of jurors during deliberations. Respectfully, we cannot agree that this provides a sound basis for reversal. First, many of the investigations were done at the request of the defense; defendants cannot embed a ground for automatic reversal into a case in this way. Second, neither the law nor the course of proceedings in the district court supports such a characterization.

Even if the facts about the investigations and any possible juror reactions and anxieties were clear, we do not read the Supreme Court's decisions as including these kinds of errors in the narrow "structural error" category. In *Remmer*, *supra*, the Supreme Court addressed the issue of possible juror bias after the court called in an FBI agent to question a juror about the incident without consulting with defense counsel. The Court remanded the case for a determination of whether "such contact with the juror was harmless to the defendant." 347 U.S. at 229. That is not the language of structural error; prejudice (or harm) is presumed and irrebuttable in structural error cases. Once we are in "harmless error" territory, the nature of the error, the strength of the government's case, and the actions the court took in response to problems are all relevant. We have already explained why we have found the errors that were properly called to our attention to be harmless, to the extent that error existed. The Supreme Court has repeatedly affirmed *Remmer* and held that "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). As our own court has noted, "[we] afford deference to the trial court as the lower court has the primary responsibility to evaluate possible influences on the jury . . . [and a] decision to deny a motion for mistrial based on juror bias therefore is reviewed according to an abuse of discretion standard." *United States v. McClinton*, 135 F.3d 1178, 1186 (7th Cir. 1998) (Kanne, J.). Therefore, even if the defendants had argued that the problems with the jury that the dissent has described amounted to structural error, we would reject that characterization in favor of a harmless error analysis.

More importantly, however, there is the problem we have already noted of finding structural error in the absence of any such argument asking for such a finding

on appeal. Even when the Supreme Court's decisions call for structural error analysis, the factual basis for finding such error may be in dispute, as it is here. See, *e.g.*, *Bracy v. Schomig*, 286 F.3d 406, 409-11 (7th Cir. 2002) (*en banc*) (discussing the type of proof necessary to prove a trial judge's bias and, thus, structural error). *Remmer* tells us that an interrogation of a sitting juror by law enforcement is not structural error. Therefore, the investigation of sitting jurors is not always structural error, even though there may be a risk, as the dissent points out, that the investigation is psychologically disturbing to the jurors. Just as in *Bracy*, we would need to determine what facts were necessary to conclude that this type of juror investigation constituted structural error. Yet the defendants raise the juror investigation issue only as support for their argument that the removal of Ezell was improper. Unlike the dissent, we are unwilling to transform this modest point into an argument that the essential right to an impartial jury was violated. To repeat our earlier conclusion, the district court took every possible step to ensure that the jury was and remained impartial, and, through credibility findings and findings of fact, concluded that this one was.

Second, throughout their briefs, the defendants note that the district court judge described some of her rulings as "difficult" or "close calls." The impression they give is that this is some kind of signal that the court knew it was wrong. We draw no such inference. A district court's acknowledgment of the difficulty of an issue, if anything, is a sign that the court has given it full consideration. When all was said and done, the court made the necessary determinations of law, which we have reviewed *de novo*, and exercised its discretion, which we have reviewed deferentially. Counsel have argued in great detail every point that they chose to bring before us, and we have limited our review of the trial proceed-

ings to those issues. The high-profile nature of these proceedings gave rise to some unusual problems with the jury, but we are satisfied that the court handled them acceptably. For all of the reasons discussed above, the district court properly denied the defendants' new trial motion. We AFFIRM the judgments of the district court convicting both Warner and Ryan.

KANNE, *Circuit Judge,* dissenting. My colleagues in the majority concede that the trial of this case may not have been "picture-perfect"—a whopping understatement by any measure. The majority then observes that the lack of a picture-perfect trial "is, in itself, nothing unusual." I agree that from my experience this is a realistic proposition. There is rarely perfection in any human endeavor—and in particular jury trials. What we expect from our judicial system is not an error free trial, but a trial process that is properly handled to achieve a fair and just result. That fair and just result was not achieved in this case.

The basis for my dissent lies not in the exceedingly drawn out evidentiary phase of this trial but in the dysfunctional jury deliberations. As to this point, the majority has taken great pains—in twenty-nine pages—to declare the flood of errors regarding the jury deliberations to be merely harmless. To understand the influences that came into play for the jurors in this case, I believe it is necessary to place various factors in overall perspective. Some of the factors would be unremarkable in a routine criminal case and other factors are totally astounding in any case. The following are highlights in summary fashion:

- In a case that was tried over a six-month period, the jurors entered and exited the courthouse every day past scores of television and still cameras and reporters.

- The jurors used public elevators and brushed elbows with anyone who happened to be in them.

- Although the court's intent was not to make the jurors' names public, that effort was compromised when the jurors' names were used in the in-court voir dire.

- When jury deliberations were ready to commence in the most high profile case in Chicago in recent memory, there was no thought of sequestering the jury.

- During the initial eight days of deliberations an apparent holdout juror was purportedly threatened by other jurors with a charge of bribery.

- Legal research gained by a juror from the internet was—contrary to the court's instruction—brought into the jury room in an effort to persuade the recalcitrant juror to change her position.

- A reporter for the *Chicago Tribune* advised the district court during jury deliberations that the newspaper's research had disclosed major inconsistencies between answers in a jury questionnaire and public records.

- Based on the information provided by the *Chicago Tribune,* the district judge, in concurrence with all parties, requested the U.S. Attorney's Office to conduct a background check on all jurors.

- Jury deliberations were halted following the *Chicago Tribune* disclosure and the hiatus contin-

ued during the investigation of the jurors by the U.S. Attorney's Office.

● During the five-day hiatus in jury deliberations, the exposé by the *Chicago Tribune* was published revealing that, indeed, false answers had been given on a jury questionnaire and that the sitting jurors were now under investigation.

● Amidst questions raised by the district judge concerning the necessity of advising the jurors of their constitutional rights and their right to counsel, the individual examination of six sitting and three alternate jurors was begun.

● Through the judge's examination it was determined that a majority of jurors had provided false answers under oath and could face criminal prosecution. Many jurors who were interrogated told the district judge that they were scared, intimidated or sorry for what had occurred.

● During the course of the interrogations, the jurors were granted immunity from prosecution by the U.S. Attorney.

● Some jurors later hired lawyers in order to represent their own independent interests arising from their participation in the trial.

● Two jurors who provided untruthful answers were excused from further service while others so situated were retained.

● Before the hiatus in deliberation, jurors informed the court that they were having a conflict and yet after the interrogations the judge dismissed one of the jurors in the conflict without determining whether she was a holdout juror.

- Alternate jurors were seated, but not in the order required by Rule 24.

- After eight days of deliberation by the original jury, and five days in hiatus, a reconstituted jury deliberated for ten days and returned the verdicts in this case.

To describe the circumstances surrounding the jury management and jury deliberations summarized above as "nothing unusual" is to simply turn a blind eye to the realities of what occurred—in order to save the efforts expended during a six-month trial.

Having summarized the factors that played upon the jurors, I'll now turn to an analysis of the various errors that accumulated. The errors in this case can be subdivided and analyzed in two groups. First, there is a structural error because of the jurors' irreconcilable conflicts of interest that resulted from the jury questionnaire situation. Second, the multiple errors regarding jury management generally and jury deliberation, when viewed collectively, were so corruptive that the verdicts cannot stand.

### The Jury Questionnaire Issue

Although the defendants raised issues relating to the effect of false answers to jury questionnaires and "fearful" jurors in the trial court, they did not argue those issues on appeal. Nevertheless, the matters concerning false responses to the jury questionnaires concern structural errors in the trial that are not governed by the plain error analysis provided in Rule 52(b) of the Federal Rules of Criminal Procedure.

In fact, the structural errors that exist here make this case "subject to automatic reversal" because they affect

the "framework in which the trial proceeds, rather than simply an error in the trial process itself." *Neder v. United States*, 527 U.S. 1, 8 (1999). "Such errors infect the entire trial process and necessarily render a trial fundamentally unfair. Put another way, these errors deprive the defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair." *Id.* at 8-9. "Among these basic fair trial rights that can never be treated as harmless is a defendant's right to an impartial adjudicator, be it judge or jury." *Gomez v. United States*, 490 U.S. 858, 876 (1989) (quoting *Gray v. Mississippi*, 481 U.S. 648, 668 (1987); *Chapman v. California*, 386 U.S. 18, 23 (1967)).

As in this case, jurors take two oaths; the first requires them to answer questions truthfully in voir dire. The second requires that they faithfully perform their duties as jurors. A juror who violates either oath can face criminal prosecution. The Supreme Court has previously upheld the criminal conviction of a juror who intentionally lied during voir dire in order to gain entry onto, and then purposefully hang, the jury. *Clark v. United States*, 289 U.S. 1 (1933). Although *Clark* was decided almost seventy-five years ago*, the prosecution of jurors for misconduct still occurs today. See generally Dyer v. Calderon*, 151 F.3d 970, 973 n.1 (9th Cir. 1998) (*en banc*) ("We do not condone any lying by jurors; perjury is perjury."); *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989) (noting that jurors committing criminal misconduct can be prosecuted for perjury and contempt of court and can be subject to restitution claims from the government).

The government instituted this prosecution against defendants Warner and Ryan. But, of course, the government is also responsible for investigating and prosecuting

crimes involving juror misconduct. The inconsistent jury questionnaire answers given in this case could lead to criminal investigations and prosecutions.

The verdicts here were delivered by a jury whose number included some who themselves faced potential future criminal prosecution for their actions that occurred during this trial. Can sitting jurors fearing possible criminal investigations and prosecution for conduct involved in the case under consideration render valid verdicts?

In ruling on the defendants' post-trial motions in September of 2006, the district judge dismissed the concern of allowing jurors to return verdicts in the same trial in which their conduct might subject them to criminal investigation and prosecution. She concluded that "in spite of the difficulties generated by this very lengthy, high-profile trial, these jurors were diligent and impartial." R. 867 at pg. 65. "[I]t is implausible that the retained jurors would harbor any fears of prosecution. As for the remaining jurors, who were not specifically questioned about their questionnaires, they would have no reason to conclude that they were targets of any investigation." *Id.* at pg. 87.

Can this court, as a matter of common sense, accept the district court's factual determination that at least some jurors did not harbor fears of prosecution when they rendered their verdicts? Can the majority say that these jurors retained their capacity to render fair and impartial verdicts that can strip the defendants of their liberty and result in the defendants receiving significant prison sentences after the jurors themselves were the subject of an investigation?

In examining the district court's decision to allow these jurors to return verdicts, that decision should be examined in the extraordinary context that had developed. After serving for six months on an extremely high-profile

trial with overwhelming media and public scrutiny, and eight days into the deliberations, on Thursday, March 23, 2006, the jurors' deliberations were stopped. When they returned four days later on Monday, March 27th, the jury was not allowed to continue deliberating. Instead, six of the sitting jurors and three alternate jurors were interrogated by the district judge. They were called one-by-one into the judge's chambers. Questions regarding inconsistent answers on the jury questionnaire form were asked. Jurors Ezell and Pavlick were ultimately dismissed, to be replaced by the two alternates. Four of the six sitting jurors were retained. The jury deliberations were stopped during this two-day period and the reconstituted jury would not start the second round of deliberations until Wednesday, March 29th.

Much like children called into the principal's office, one could imagine the strain that this inquiry placed on both the jurors who were questioned and those who remained in the jury room unquestioned. It is noteworthy that in describing her experience in examining Juror Casino, the district judge stated, "Grilling Mr. Casino is one of the most distasteful things I have done in this job." Mar. 28, 2006 Tr. at pg. 24658, ln. 25 & pg. 24659, ln. 1. It is also reasonable to conclude that the jurors who were called into the judge's chambers began discussing their experience with the other jurors upon return to the jury room to figure out what was going on.

Even more telling is that the district judge on March 27th recognized, along with various counsel, the specter of juror prosecution lurking in the case and the impact this would have on the trial. March 27th and 28th are key days in the case because these are the two days that the district judge considered how to handle the juror questionnaire issue and thus it is worth examining closely the record from these two days. The district judge, shortly before her examination of then-sitting Juror Ezell, recog-

nized that the jurors faced possible criminal charges for juror misconduct when she observed:

> A concern I have, beginning with Ms. Ezell, is that if we were to bring Ms. Ezell in to ask questions of her regarding her failure to disclose this arrest record that she has and other issues—for example, the apparent use of an alias—**Do we have to advise her of her rights? Do we have to give her an opportunity to have counsel?** Because it does seem to me that we will be asking her potentially about **criminal conduct**, specifically **perjury** in connection with her responses to the questionnaires.

Mar. 27, 2006 Tr. at pg. 24366, lns. 16-24 (emphasis added). Prosecutor Collins added that "I do think to the extent there are consequences to a criminal prosecution [of the jurors] we would be recused from it if there was even contemplation of such a thing." Mar. 27, 2006 Tr. at pg. 24386, lns. 19-22.

Mr. Genson, an attorney for defendant Warner, added that his client was in a Catch-22 situation:

> Certainly, when I have a client that's charged essentially—at least that was a good deal of the closing argument—with concealing, hiding, there is charges of obstruction, false statements, the idea that I want to tell these jurors, "You have a right to a lawyer," is ludicrous. It doesn't help me to do that. I don't want to do it.

> On the other hand, I am suggesting to your Honor that perhaps we should. It's not to my interest to tell these jurors, or at least in my client's interests to tell these jurors, they need a lawyer. I mean, I don't need to introduce all those things given the charges against my client.

> But I do think it's a valid—if something happens in this case and if some other prosecutorial body, given

that Mr. Collins said that they would be recused, decides to prosecute people for false statement and we haven't given them their rights, I mean, I just feel that—I think that's at least an issue that your Honor has to consider.

Mar. 27, 2006 Tr. at pg. 24404, ln. 25 & pg. 24405, lns. 1-17.

The court recessed for lunch in the middle of its juror interrogation procedure on March 27th. After lunch, Mr. Collins informed the parties and the court that the U.S. Attorney had granted the jurors immunity.

For the record, we did consult, your Honor, with the U.S. Attorney at the lunch break in terms of jeopardy any jurors would have going forward. And we did not address the issue in advance of Ezell and Pavlick, and I would make this of record.

Our office—[U.S. Attorney] Fitzgerald has indicated that he believes that it's more important to get the candid information from the jurors than have them— the process chilled by them—any statements they say being used against them. And so he authorized me to make a statement that any statements these jurors make *going forward* would not be used against them.

Mar. 27, 2006 Tr. at pg. 24500, lns. 16-25 & pg. 24501, lns. 1-2 (emphasis added). Note that the immunity grant covered the jurors' statements "going forward." The record does not reflect whether the U.S. Attorney granted immunity to the jurors for their original conduct of their answers provided during voir dire on the questionnaire and therefore there is a potential that these jurors could still face criminal prosecution. The district court proceeded in questioning the jurors informally without an advisement of rights and without the presence of lawyers for the jurors.

Jurors who ultimately would render the verdicts now faced conflicts sufficient enough to have a federal district judge and several experienced attorneys consider whether these jurors needed to be advised of their constitutional rights. And we have an experienced prosecutor, the United States Attorney, who sees this situation as serious enough to grant immunity to the jurors. Yet these same jurors were returned to the jury room, instructed to begin anew their deliberations. The reconstituted jury ultimately rendered the verdicts in this case.

When the district judge wonders aloud whether warning jurors of their constitutional rights is required, when jurors could need their own lawyers, and when the U.S. Attorney is issuing immunity grants to jurors, it is impossible not to recognize the extraordinary nature of the case. These circumstances are not "usual" and far from the way our criminal justice system should work.

In addition, the district court's ruling from September 2006 that "it is implausible that the . . . jurors would harbor any fears of prosecution," R. 867 at pg. 87, is not supported by the record. Although counsel was not appointed for the jurors, individual jurors would obtain private counsel in this case. Juror Pavlick had previous representation and mentioned his attorney when he was interrogated individually by the district court. Jurors Peterson and Losacco would both later inform the court that they had obtained counsel. Several of the individual jurors questioned during this period recognized that they had made inconsistent statements on the juror questionnaire and some apologized for the mistake. Other jurors specifically mentioned that they were scared or intimidated by the situation.

Furthermore, this is not a situation in which the district court can solve the problem by saying that the jurors made an honest mistake. The decision as to wheth-

er to investigate and prosecute a case is not the district court's to make but rather the prosecutor's decision. Additionally, the question of whether a juror incorrectly but honestly answered a question or intentionally lied to get onto a jury is a question of fact for a *second* jury in a future criminal proceeding.

Despite recognizing the potential of "fearful" jurors, the district court was unwilling to declare a mistrial. In addressing the defendants' argument that the investigation had impacted the jurors' ability to be fair and impartial the district court responded:

> The . . . argument you are making is that we now have a bunch of fearful jurors. ***I just don't know how to address that***.
>
> Again, I understand that the defendants do have important interests to represent here. I have before me—nobody has called it this, but this is a motion for a mistrial at this point. If I grant this motion, these defendants are going to be tried again. I don't—I am just—I am really wondering whether if I grant the motion for a mistrial, I am effectively saying it isn't possible to pick a jury for this case.

Mar. 28, 2006 Tr. at pg. 24699, lns. 16-25 & pg. 24700, ln. 1 (emphasis added). The obvious—but onerous—way to address this situation was to declare a mistrial. In any event, the concern regarding the selection of a new jury should not have been a consideration. It is not difficult to understand the great pressure generated by a six-month trial to reach verdicts in this case. Nevertheless, jurors in fear of prosecution for conduct involved in the case on which they are sitting should not be allowed to render verdicts; their bias is inherent.

As a matter of law, biased jurors cannot be fair and impartial. Fair and impartial jurors are required as part

of the defendants' structural protection for a fair trial and therefore the defendants are entitled to an automatic reversal of their convictions. *Neder*, 527 U.S. at 9.

The majority responds that the defendants were afforded the structural protections of a fair trial before a fair and impartial jury and therefore any error relating to jury misconduct, improper influence of the jury and jury bias should be reviewed under harmless error. Maj. Op. 60. "The bias of a . . . juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law." *United States v. Wood*, 299 U.S. 123, 133 (1936). As Chief Justice Marshall explained at the trial of Aaron Burr, there are certain situations in which a juror "may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice." *United States v. Burr*, 25 F. Cas. 49, 51 (C.C.D. Va. 1807). Although the "[u]se of the 'implied bias' doctrine is certainly the rare exception," *Hunley v. Godinez*, 975 F.2d 316, 318 (7th Cir. 1992) (per curium), as we recognized in *United States v. Polichemi*:

> The concept of implied bias is well-established in the law. Many of the rules that require excusing a juror for cause are based on implied bias, rather than actual bias. For example, a court must excuse a juror for cause if the juror is related to one of the parties in the case, or if the juror has even a tiny financial interest in the case. *See, e.g.*, *United States v. Annigoni*, 96 F.3d 1132, 1138 (9th Cir. 1996); *Getter v. Wal-Mart Stores*, 66 F.3d 1119, 1122 (10th Cir. 1995). Such a juror may well be objective in fact, but the relationship is so close that the law errs on the side of caution.

219 F.3d 698, 704 (7th Cir. 2000) (Wood, D., J.); *see, e.g.*, *Smith v. Phillips*, 455 U.S. 209, 221-24 (1982) (O'Connor,

J., concurring); *Conaway v. Polk*, 453 F.3d 567, 587-88 & n.22 (4th Cir. 2006) (noting that "implied bias [is] a settled constitutional principle" and providing citation to cases from ten different Circuits since 1982 recognizing the continuing applicability of the implied bias doctrine); *Brooks v. Dretke*, 418 F.3d 430, 430-31 (5th Cir. 2005) (overturning a conviction on the basis of implied jury bias when a juror faced a pending criminal charge filed by the same prosecutor's office that was prosecuting the case on which the jury was presiding); *Dyer*, 151 F.3d at 984 (citing *Dr. Bonham's Case*, 77 Eng. Rep. 646, 652 (C.P. 1610) (tracing the lineage of the implied bias doctrine to Sir Edward Coke's dicta in *Dr. Bonham's Case* in 1610)).

A biased juror "is a juror in name only" who taints the court and the jury's verdict making it a "mere pretense and sham." *Clark*, 289 U.S. at 11. The verdicts returned by these biased jurors should be vacated because only a jury composed of fair and impartial jurors can strip the defendants of their liberty. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

## General Management of the Jury and Jury Misconduct

It is also necessary to review additional jury misconduct and the jury management decisions of the district judge. Errors of a nonstructural nature are analyzed under Federal Rule of Criminal Procedure 52, where errors raised by the defendants are reviewed under a harmless error standard and those not raised are reviewed under a plain error standard.

The majority determines that on appeal the defendants raised three specific issues about the jury: (1) that the verdict was tainted by the jurors' use of extraneous legal

materials; (2) that the dismissal of Juror Ezell was an arbitrary removal of a defense holdout, and; (3) that the substitution of jurors after deliberation had begun was prejudicial. Maj. Op. p.2. In addition, the majority notes that the defendants have not raised on appeal the issue of the cumulative and prejudicial effect of jury misconduct and therefore that issue is not before us—although raised below. *Id.*

The majority correctly observes that jury management or control measures properly lie within the discretion of the district judge. Maj. Op. p.58. Nevertheless, courts of appeal have supervisory authority in fashioning standards of criminal procedure to be followed by the district courts. WAYNE R. LAFAVE, et al., CRIMINAL PROCEDURE § 1.6(i) pg. 325 (2d ed. 1999).

I disagree with the narrowed scope of review advanced by the majority. What follows is a discussion of a more global look at the juror misconduct and jury management involved in this case.

Of course, as repeatedly pointed out, this court is guided by the Supreme Court's instruction that the defendants are guaranteed a right to a "fair trial," not a "perfect trial." *McDonough Power Equip. Inc. v. Greenwood*, 464 U.S 548, 553 (1984).

As to the internet research regarding the law, there is no dispute that Juror Peterson brought outside material into the jury room during deliberations while she and a number of jurors were in conflict with Juror Ezell. A number of jurors urged Juror Peterson to search the internet and bring back to the jury information on jury deliberation. Her research could be used to show Juror Ezell the "error of her ways." This entire episode was a deliberate disregard of the admonition of the court not to bring outside legal sources into the jury room.

Juror Peterson claims that the material was an American Judicature Society article about deliberations and she had no intent to inappropriately influence Juror Ezell. Juror Ezell disputes this claim, countering that the information related to bribery and was used to threaten her so that she would vote with the other jurors. Regardless, it is clear that Juror Peterson brought outside material into the jury room during the course of deliberations and used this material as part of the jurors' efforts to convince Juror Ezell to join them in returning a verdict.

In her post-trial ruling, the district court determined that the article on jury deliberation "did not pertain to any substantive issue in the Defendants' trial. It concerned only the process of deliberation, and the substance of the article did not contradict any instruction that this court gave to the jurors." R. 867 at pg. 81. Errors in the jury deliberation process raise issues of law no different than errors relating to substantive matters, such as obstruction of justice. Both procedural and substantive areas of law are equally important. Moreover, a court cannot hide behind saying that the unauthorized article contained a proper statement of the law. It is axiomatic that jurors are not allowed to bring any outside materials into deliberations regardless of whether they are a correct statement of the law. Jurors are restricted to receiving pronouncements on relevant law only from the trial judge.

The seriousness of this misconduct is demonstrated by the fact that Juror Peterson and Juror Losacco, who were involved in the conflict with Juror Ezell, both obtained private counsel to represent them on this issue. The record does not reflect whether Jurors Peterson and Losacco retained their attorneys during deliberations or after deliberations as Juror Ezell did not make a public allegation against Jurors Peterson and Losacco until after the verdicts had been returned. However, when the

district court conducted a post-verdict inquiry on this issue, both Jurors Peterson and Losacco appeared through their respective counsel.

The jurors originally sent notes informing the district court that they were in conflict. This is the conflict between Juror Ezell and several of the other jurors including Juror Peterson. Juror Peterson was instructed by several other jurors to—"do her homework"—meaning to find information on the internet which the jurors could use in a hope of convincing Juror Ezell to join their views.

However, during the period that the district judge was considering what to do about the conflict among the jurors, she was also informed about the juror questionnaire problem. Thus, the court was faced with two independent problems, the jury conflict issue and the juror questionnaire issue. Yet, the juror questionnaire issue *wholly consumed* the district judge's consideration of the case at that point. The district judge left unresolved her consideration of the conflict between potential "holdout" Juror Ezell and other jurors. Nowhere in the record does the district judge make a ruling as to whether a conflict existed between Juror Ezell and the other jurors to determine if the jurors had deadlocked or if Juror Ezell was indeed a holdout. Nor did the court determine the impact that dismissing Juror Ezell would have on the other jurors in light of the conflict among the jury as expressed to the court in the jurors' notes, and whether this might give an indication to other jurors that the court was siding with the views of one group of jurors over another. However, the district judge ultimately excused Juror Ezell based on the inconsistent statements Juror Ezell made on her questionnaire.

At the beginning of the trial, the district judge ordered the juror questionnaires to be redacted, yet she used the jurors' names during in-court voir dire. This allowed the

*Chicago Tribune* to obtain the jurors' names from the transcripts of the in-court voir dire despite the fact that the court had originally placed the jurors' names under seal. As Prosecutor Collins later noted, "a trained monkey" could have matched the information together between the publicly redacted questionnaires and in-court voir dire transcripts. Mar. 27, 2006 Tr. at pg. 24591, ln. 22. Because jurors' names were "in effect" leaked to the media during the trial, the court was unable to avoid the larger issue of a juror background investigation by the media and the impact this had on the trial.

Apart from the general admonitions made by the court it appears that there was little control of the jurors' exposure to external influences outside of the courthouse. In addition to Juror Peterson's misconduct, the jurors continued to read newspapers and were exposed to media coverage of the trial, the jurors received inquiries from friends and family about the case, and the jurors discussed the case with outsiders while the case was pending. All of these actions were taken in violation of the court's instructions, yet a reconstituted jury was allowed to deliberate and return verdicts.

There is often a lack of a record on key issues. The district judge participated in a discussion with the parties but did not state that she was providing a definite ruling. Thus, the record is at best inconclusive, and at the worst nonexistent, on the district court's decisions on many of the critical issues in this case. The most striking example is the reseating of the alternate jurors. Once the district judge decided to excuse Jurors Pavlick and Ezell, the court was required, pursuant to Rule 24, to seat alternate jurors in the order in which they were selected. However, in the reseating process the district judge skipped the next juror in line, Alternate Juror Masri. We know that he was skipped but the district judge did not say why he was passed over.

The majority deduces that Alternate Juror Masri was dismissed for his failure to disclose a prior DUI. But, there is no ruling from the district judge to support the majority's deduction. The government suggested at oral argument that Masri was excused because he received his juror certificate and was thanked for his service. But there is no record excusing him or indicating why he did not serve. Thus, the record does not demonstrate compliance with Rule 24.

At oral argument before this court, Prosecutor Collins stated that "Judge Pallmeyer is a consensus builder." Oral Arg. at 47:18. This insightful comment is the key to understanding the non-structural juror errors. Consensus building can help in finding common ground in disputes. It can also help to expose decision makers to alternative points of view. But consensus building can have negative consequences as this case demonstrates.

Consensus building by the district judge allowed a continual round robin of discussions between the attorneys and the court especially during the critical period of March 27th and 28th when the parties and the court were addressing the juror-related issues. Transcripts from this period reveal a very conscientious but irresolute judge who is willing to contribute her views and concerns to the conversation involving contested issues, but is reluctant to provide firm rulings that end the court's consideration of those issues. The record from this period is full of conversations but lacks definitive rulings. Consensus building does not always lead to the resolution of difficult issues.

A lack of definitive rulings by the trial court presents great difficulty in a review on appeal, for appellate courts review decisions, not commentary. Importantly, the lack of a firm ruling infects the consideration of excusing potential "holdout" Juror Ezell. In her post-trial ruling,

the district judge said that Juror Ezell was "removed from the jury for reasons wholly unrelated to [the] conflict [occurring between the jurors] revealed in [Juror] Losacco's note." R. 867 at pg. 75. Yet, the district judge's post-trial decision did not provide citation to the record on this point. In fact, a review of the record during the March 27th and 28th period shows there was absolutely no consideration of the conflict between Juror Ezell and other jurors. As noted earlier, this very serious issue was forgotten once the court and parties were made aware of the trouble in the jurors' questionnaire answers by the *Chicago Tribune*.

The district judge is charged with the management and control of the jury. In the deliberation phase this includes ensuring that the jurors properly conduct themselves, avoiding outside influences, conducting proper deliberations without juror-on-juror intimidation, and scheduling deliberation times, among others.

As noted, many of the problems that plagued the trial after the case was submitted to the jury could have been avoided through sequestration. While it was certainly impractical to sequester this jury during the trial phase, sequestration during deliberations was a viable option.

In a full sequestration, deliberating jurors are typically under control of Deputy United States Marshals who are responsible for ensuring that the jurors are secure during their deliberations, in movement to and from the courthouse and jury room, and while housed offsite until a verdict is reached. Partial sequestration works less of a hardship on jurors. Under this system the deliberating jurors assemble at a remote location and are picked up by Deputy United States Marshals, transported by van to the courthouse and moved in a nonpublic elevator to the jury room. At the end of a day's deliberations the process is reversed. This continues until a return of the verdict.

Despite these available options there was no apparent consideration of such sequestration even in the face of the overwhelming media presence in the courthouse, the daily media reports of courtroom activity and the jurors' continued inability during the course of the trial to avoid media reports of the trial. The relative inconvenience to the jurors weighed against a possible mistrial makes the choice of sequestration during deliberation seem clear.

Turning again to the actual deliberations, it appears that jurors were inexplicably allowed to set their own schedule for deliberations with apparently little judicial intervention. There is undisputed evidence that the jurors separated into caucuses at times during deliberations. Perhaps most striking is the example of the division between the "healthy" and the "unhealthy" jurors. The healthy jurors exercised by running up and down internal courthouse stairs while the unhealthy jurors took smoke breaks outside the courthouse. The record does not tell us if the jurors continued separate deliberations during this period outside of the presence of the other jurors.

As noted above, I recognize that individual nonstructural errors are reviewed under either harmless error or the plain error analysis as provided in Rule 52 and we afford the district judge a level of deference. However, the nonstructural errors—in their totality—were so egregious that again a mistrial was the only permissible result. The majority's failure to consider all of these errors cannot be ignored as we must recognize that these errors undermine the public's confidence in the "fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736-37 (1993).

In the final analysis, this case was inexorably driven to a defective conclusion by the natural human desire to bring an end to the massive expenditure of time and

resources occasioned by this trial—to the detriment of the defendants. Given the breadth and depth of both structural and nonstructural errors, I have no doubt that if this case had been a six-day trial, rather than a six-month trial, a mistrial would have been swiftly declared. It should have been here.

Based on either the structural errors or nonstructural errors described above concerning jury misconduct, the convictions in this case should be vacated and the case remanded for a new trial. Because the majority reaches a contrary result, I respectfully DISSENT.

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
